DANIEL ISAACS, APPELLEE, V. RACHEL DAVIS ISAACS, APPELLANT.

FILED APRIL 7, 1904.   No. 13,426.

1. Antenuptial Agreements. While antenuptial agreements may essentially alter the interest which either the husband or wife takes in the property of the other, they can not vary the terms of the conjugal relation itself; they can not add to or take away the personal rights and duties of husband and wife.

2. ———. An antenuptial agreement by a man about to be married,

that, after marriage, he will reside in a particular state, can not be enforced.

3. **Domicile.** The general rule is that the domicile of the husband is the domicile of the wife.

4. ————. The wife is bound to follow her husband when he changes residence, if such change is made in good faith.

5. **Husband and Wife:** SUPPORT. When a wife, without just cause, refuses to live with her husband, he is not required to contribute to her support.

6. **Divorce and Alimony.** When a wife, without cause, refuses to live with her husband, and the evidence shows that she did not assist in or contribute to the accumulation of any of his property, but that it was all accumulated by him prior to their marriage, the husband, on obtaining a divorce on the ground of desertion, will not be required to pay alimony.

7. **Evidence.** Evidence examined, and *held* to fully sustain the findings and judgment of the trial court.

APPEAL from the district court for Wayne county: JAMES F. BOYD, JUDGE. *Affirmed.*

*Wilbur & Berry,* for appellant.

*A. A. Welsh, contra.*

FAWCETT, C.

This is a suit by plaintiff for a divorce on the ground of desertion, with a petition in the usual form. Defendant, answering, admits the marriage and denies all the other allegations of plaintiff's petition, and, for cross-petition, asks for a divorce on the grounds: First, of desertion; and, second, failure to support. She bases her claim of desertion on the allegations that, prior to her marriage with the plaintiff, he agreed with her that he would make his home, after their marriage, in the state of Ohio; that without this promise she would not have married him; that on or about the first day of November, 1900, being the same year in which they were married, plaintiff left the defendant in Cincinnati, stating that he was going to Ironton, Ohio; and that instead of going to Ironton he

came to Wayne county, Nebraska, without the consent or knowledge of the defendant. For reply, plaintiff says that, prior to his marriage with defendant, he expected to make his home, after their marriage, in the state of Ohio; that, after their marriage, he made numerous efforts to get into business or to obtain employment in that state, but was unable to do so, whereupon he repeatedly solicited the defendant to come to Wayne county, Nebraska, to make their home, but that defendant refused and has ever since refused; and in November, 1900, plaintiff, being unable to find a place in Ohio suitable and satisfactory, came to Wayne county, Nebraska, where he had resided prior to their marriage, and where he owned a well improved farm of 320 acres of land; that since coming to Wayne county he has repeatedly requested defendant to come and live with him, and, upon her refusal so to do, has offered to return to Ohio and make his home there, if defendant would live with him, but that defendant refused to live with him either in Nebraska or Ohio; that he is now ready and willing to provide a home and live with the defendant either in the state of Nebraska or the state of Ohio, and offers to return to Ohio and live with the defendant; alleges that for a long time prior to his marriage with defendant, he had resided in Wayne county, Nebraska, with his family, consisting of 5 children by a former wife, then deceased; that defendant has never contributed in any manner to the accumulation of any of the property of plaintiff or assisted in the care thereof; that defendant is possessed of a one-fifth interest in a house and lot in Norwood, Ohio, where she resides with her sisters, as the co-owners thereof; that he has always been ready and willing to contribute to the support of defendant, and has sent her money, which defendant has refused to receive.

The evidence shows that the parties were married in April, 1900; that defendant had a decided aversion to coming to Nebraska, preferring to live in Ohio, where she had lived all her life, and where plaintiff had spent the early years of his life; that, after the marriage, they came

to Nebraska and spent a couple of months together on plaintiff's farm in Wayne county, defendant returning to Ohio during the summer, and plaintiff agreeing to follow her in September.  In September, plaintiff returned to Ohio in accordance with this arrangement, and began his efforts to get into a business of some kind which he would be able to manage, or, failing in that, to obtain some suitable employment.  He seems to have been quite persistent in his efforts in this direction.  The evidence satisfies us, as it doubtless did the trial court, that those efforts were made in good faith, and that he did everything in his power to gratify the wish of his wife.  On the evening of November 4, 1900, he returned to the defendant's old home, where she was living with her sisters while he was making the efforts to secure a business, above referred to, feeling rather discouraged at another failure of his plans.  Defendant seems to have been angry at him on account of this failure, and told him he could not stay there that night.  After some talk between them, she partially relented and permitted him to remain in the house that night, but refused to occupy the same room with him, telling him that he would have to occupy another room, which he did.  The next morning he left her with the understanding that he would make another trip to Ironton, and try and make some kind of an arrangement by which they could move there.  After leaving the house, under the effects of the chilly reception which he had received the evening before, he said he was feeling homesick, and concluded that he would take a trip to Nebraska; so, instead of going to Ironton he took the train for Omaha.  The first thing he did after arriving in Omaha was to write to his wife, telling her what he had done, and expressing sincere regret that he had left her and come to Nebraska without telling her that he was going to do so, and asked her forgiveness for having done so.  He waited some time, and, receiving no answer, he again wrote her from his farm in Wayne county.  Receiving no answer to that, he wrote a third letter.  To this he received this answer:

"NORWOOD, OHIO, December 16, 1900.

"*Mr. Isaacs*—Sir: You deserted me once for all. I will have nothing more to do with you. You have made many good promises to me but kept none of them. I do not want you to come back to Ohio, as you left me without a cause. Hoping this will be satisfactory, I remain,

"RACHEL DAVIS ISAACS."

Notwithstanding this letter plaintiff kept writing to his wife, urging her to reconsider the matter, calling her attention to the fact that he had been unable to get into business in Ohio, that he had a good home in Nebraska and could support her in proper manner here. Finding that she would not yield, he then wrote her that he would return to Ohio and secure a home for them there. Receiving no word from her, in the fall of 1901 he returned to Ohio, learned where she was stopping, and went to the house between 7 and 8 o'clock in the evening, to see her. In answer to his rap at the door she appeared and, on observing who it was, slammed the screen door shut and retired to another room in the rear of the house. He went around to the window and importuned her to talk the matter over with him. She finally told him to go around to the door, where she met him, but she kept the screen door closed and would not permit him to enter. He reasoned with her there, and offered to return to Ohio, but she was obdurate, claiming that he had blasted her life and that she would not have anything more to do with him. He tried to have an interview with her the next day, which she refused to grant, claiming that she had a prior engagement. After remaining in Ohio a while he returned to Nebraska; but, before leaving, left a letter with her sister, to be forwarded to her. She answered this letter November 3, 1901, saying:

"*Mr. Isaacs:* Your letter received about a week ago, in which you make some very good promises if I would live with you. I trusted you once on your good promises until you failed to keep one of them, and asked me to work for

my board, which was more than I could endure. I was not conscious at the time that you had any intention of leaving me to fight my way through the world as your wife, which has caused me many a heart ache and blighted my life forever. You wished me to write you this one letter, which I will do, as I promised. I always thought you would support me until I gave you the opportunity, then I found I was very much mistaken. You said as I had an interest in our home I could live there, which is very true; I could; at the same time I could not eat the house nor dress with it. On the other hand it takes money to keep the house in repair and I must do my part as I have no one to do for me since my married life has been a failure. Hoping you will always be happy with your family, will close. From RACHEL DAVIS ISAACS."

To this plaintiff replied, saying, among other things:

"Now, my dear wife, I hope you will not be offended by my writing you this time; you know we are tied together for life and there is not a day but I think of it a thousand times and am willing to do anything I can in order that we can live together. * * * I will send you money as soon as you send me your address, and I am going to ask you won't you please promise to live with me so I can close the deal on the home I have in view in Jackson county, Ohio, and I will promise that I will try to do all I can to make our home happy, and I will do as I say. As soon as I close the deal I will send the papers to you to hold, and I can not tell you how glad my children would be if we were living together. If you get this letter please write so I can close the deal if you will consent. This from your loving husband, DANIEL ISAACS."

He wrote her again on December 16, in which, among other things, he says:

"Now, Rachel, it was a mistake on my part. I hope you will forgive me. I am going to ask you to write yourself and if you will state any terms that I can comply with

I will be glad to do it for I think we could live happy if we only get started. I can rent or sell my farm to good advantage, and I can go back east to live. * * * Now, my dear wife, if you will forgive me the past I will be glad to send money to support you until we can get to living together, and I hope I will get to hear from you soon. This from your loving husband,         Daniel Isaacs."

In this letter he enclosed a draft for $25 as a Christmas gift. The letter, envelope and draft were all returned to him by the defendant, with this endorsement on the letter: "December 31, 1901.  Opened, read and returned by Rachel Davis Isaacs."

The above are only brief extracts from the many kind and affectionate letters written by plaintiff to the defendant, urging her to forgive him for the one slight error of coming to Nebraska in November, 1900, without previously informing her of his intention so to do.  This act of his she construes into a great wrong:  One which, she says, blasted her life, and which she was never willing to forgive.  We are absolutely unable to conceive how de-defendant could have become imbued with such a silly idea.  The alleged antenuptial agreement, that he would always live in Ohio, was void.  As stated by counsel for appellee, "Valid antenuptial contracts can only be made with reference to the property of one another and their rights thereto.  They change and control the general rule of the marriage state in reference to property only."  And, as stated in Schouler, Domestic Relations (3d ed.), sec. 171:  "They can not vary the terms of the conjugal relation itself; they can not add to or take away from the personal rights and duties of husband and wife; but they may essentially alter the interest which each takes in the property of the other."  The general rule is that the domicile of the wife follows that of the husband and that he has the right to fix their domicile; the wife is bound to follow the husband when he changes his residence, if such change is made in good faith.  The authorities in support

of this principle are so numerous and uniform that it is unnecessary to cite them. But, conceding that plaintiff had agreed, prior to the marriage, that he would always live in Ohio; if, after the marriage, he, in good faith, tried to secure employment or a business of some kind there and was unable to do so, and had a good home of 320 acres of land in Wayne county, Nebraska, at his disposal, he had a perfect right to return to that home and to insist that his wife should go there with him, and her refusal so to do would constitute desertion on her part. He was under no obligation to surrender his home that he had worked years to establish, and return to Ohio and engage in a business enterprise, without experience, and possibly, nay, probably, lose the earnings of years in that enterprise; and if the defendant had even the faintest conception of her marital duties, she would not have required him to continue tramping around through the state of Ohio seeking employment or business, but would have promptly and cheerfully accompanied him to the good home which he had already established in Nebraska.

A sufficient answer to defendant's plea of nonsupport is that a man is not required to support his wife when she, without just cause, refuses to live with him.

From the questions asked by defendant's counsel on the trial of the case, it is apparent that defendant cares nothing about the marriage relation or as to who succeeds in obtaining the decree of divorce, provided she is given a goodly portion of the property, which she never assisted the plaintiff to accumulate. If the trial court had awarded her even a very small amount of alimony, we are satisfied that this court never would have been troubled with an appeal in this case. On the trial the court awarded her $100 for expense money in defending the suit, but, after hearing the case, refused to allow her any alimony, and ordered that each party pay their own costs. This is the part of the decree that was grievous to defendant; but we think the court did right. When a wife, absolutely without cause, deliberately refuses to live with

her husband, and has not helped to accumulate any of his estate, we know of no law which entitles her to alimony.

We have read the record very carefully, and are unable to discover any error therein. The judgment of the district court is right in all respects and should be affirmed; and we so recommend.

ALBERT and GLANVILLE, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.