GRETA L. SAUM BARTON, APPELLANT, V. HARRY C. BARTON, APPELLEE.*

FILED APRIL 27, 1934. No. 28909.

*John A. McKenzie* and *O'Sullivan & Southard,* for appellant.

*Patrick & Smith, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and MESSMORE, District Judge.

PAINE, J.

Action was brought by a wife to obtain a decree of separate maintenance on the ground of extreme cruelty. Defendant filed a cross-petition, praying for an absolute divorce. After a spirited trial, the plaintiff was granted a divorce. She was allowed $300 alimony, payable at the rate of $50 a month, together with attorney fees in the sum of $700. The trial court dismissed the defendant's cross-petition. The plaintiff appeals from that part of the decree which awards her but $300 permanent alimony.

Plaintiff asked for separate maintenance, with $300 a month for support, and $1,500 attorney fees. Defendant filed a general denial by way of answer to the amended petition, and prayed for an absolute divorce in his cross-petition. The court entered a decree, finding generally that the allegations of plaintiff's amended petition were true, and that the defendant had been guilty of extreme

---

*Remanded for taxation of costs. See opinion, p. 846, *post.*

cruelty, and granted the plaintiff an absolute decree of divorce, with permanent alimony of $300, payable at the rate of $50 a month for six months from the signing of the decree, the first payment to be due May 12, 1933, and allowed her $700 attorney fees, payable at the rate of $100 a month, and dismissed the cross-petition of the defendant. From the alimony awarded, the plaintiff appealed to this court.

The bill of exceptions filed in this case consists of three thick volumes, embracing the testimony of many witnesses, together with a large number of exhibits, including extensive write-ups and pictures of the parties in Sunday newspapers, checks, letters and photographs.

To give a fair reflection of the evidence in this bitterly contested divorce case it may be better to state first the principal claims of each side separately. The plaintiff testifies, and presents the testimony of friends, to prove about the following state of facts: That she was 24 years of age, and the defendant was 52 years of age, having an only child, a married daughter 26 years of age. The defendant had been successfully engaged in the laundry business in Omaha, and, having retired as a wealthy man, was possessed of a large amount of real and personal property. That she was raised on a farm near Maywood, Nebraska, and at the age of 17 came to Omaha and completed the business course in a business college, including bookkeeping and shorthand, and was thereafter employed by the Standard Oil Company for more than a year, the Manhattan Oil Company for more than a year, the Otis Elevator Company for more than two years, and then by the Westinghouse Electric Company, where she was working at the time she was married. That in September, 1931, she met the defendant at a bridge party at the home of her friends Mr. and Mrs. L. C. Gibson. That the defendant immediately began taking her to dinners and theaters and other entertainments, and after a whirlwind courtship of about four months they were married on February 3, 1932, at Kansas City, instead of

Omaha, at the request of the defendant, the plaintiff being accompanied to Kansas City by her friends, Mr. and Mrs. L. C. Gibson, who returned to Omaha the next day, making the trip at the expense of the defendant. That the plaintiff and defendant then took a very extensive and expensive honeymoon trip, visiting St. Louis for three days, Memphis two days, New Orleans five days, with visits to Biloxi, Pensacola, Jacksonville, St. Augustine, Palm Beach, Miami, Key West, and Havana. Then followed a 13-day ocean trip through the Panama Canal to Los Angeles, where they took an apartment, and defendant purchased an automobile for driving around California. They returned by way of Portland and Seattle, and stopped at North Platte, where the plaintiff's mother and brother came from Maywood to visit them, and reached Omaha May 28, 1932. Upon the return to Omaha they went out to defendant's former home, 3022 Lafayette Avenue, and the Gibsons called upon them the first evening, having missed them at the depot. In the bunch of mail awaiting him at the house was one letter which he handed to Mr. Gibson to read, it being a letter from Attorney McGan on behalf of Thelma Holman, saying that, unless a settlement was made on or before the following Tuesday, suit would be filed against him. At that time Mr. Barton said that the girl was simply trying to blackmail him, and he had prior to that time, during the courtship, stated that this Thelma Holman was an orphan who had worked in his laundry, and whom he had shown many kindnesses, but only in a fatherly way. After the Gibsons had gone, the defendant was worried; said he did not care to live any longer, did not sleep well, and about 6 o'clock the next morning he sat up in bed and confessed to the relations with Thelma Holman, admitting that he had misrepresented his relations to her, and that he had been intimate with her prior to the death of his former wife, which relations had continued for six or seven years; that he had given her about three or four thousand dollars in cash, a fur coat, a diamond ring, and

two automobiles, and had taken her on vacation trips, staying in Minnesota in a cottage for two weeks, and also at Estes Park, Colorado, where they had a cottage and lived together as man and wife. That after breakfast the defendant went to his room and slept a while, and the plaintiff gathered up her things and went to the L. C. Gibson home, and testifies that she was humiliated and shocked to find the kind of a man she had married, and that she stayed at the Gibson home for 5½ weeks, Mr. Barton telephoning to her and calling on her there, and on his first visit to the Gibson home to see her, when he failed to persuade her to come back and live with him, he threatened to go down and see a lawyer and sue her for divorce. On another occasion he wanted to know if she would sign deeds to his real estate before the lawsuit was started by Thelma Holman, so he could transfer all his property out of his name. However, about ten days after the return to Omaha defendant settled the Holman case through her attorney by paying $5,000.

The defendant presents an entirely different state of facts. His brief begins with this paragraph: "In legal terminology, this is a suit for divorce, but in its real purpose it is an action by a designing woman to strip Harry Barton of the little of 'this world's goods' that he has accumulated through years of toil, to which she did not, directly or indirectly, contribute a single cent." Then follows the statement: "Let us examine the record and get the true picture of this woman that counsel attempts to portray before this court as an angelic symbol in human form. Let us unmask this 'babe in the woods,' as counsel term her." The defendant claims that they met in the fall of 1931 at Gibson's; and in December marriage was agreed upon between them, and that he gave her an engagement ring costing $650, because she was not satisfied with one he had selected for less money; that he gave her $405 before their marriage to pay her debts, and made her beneficiary in his life insurance policies to the extent of $6,000; that on the day of the

wedding in Kansas City she wanted photographs taken at $40 a dozen, and became very hostile when the defendant would only purchase some costing $25 a dozen; that she insisted upon attempting to attend a premier showing of a picture in Hollywood when admissions were $5.50 a person, but did not go, as the house had been sold out, and the same show could be seen the next night for 75 cents. That Barton learned in California that he had met with financial reverses in connection with some of his investments, and wanted to return to Omaha immediately, but she objected to any curtailment of the wedding trip, and threatened to go on alone, and the defendant finally completed the trip as originally planned, with the single exception of going from Seattle to Vancouver. That, with the extensive wedding trip over, she seized upon the first pretext to leave him, and never returned, except for money or to loot her husband's apartment in his absence. That Barton made the settlement with Thelma Holman for $5,000 to protect the plaintiff from embarrassment and avoid publicity, in the hope that this settlement would bring about her return, but that the plaintiff gave interviews to the Bee-News and the World-Herald, furnishing pictures to the reporters, and revealing the defendant in the worst possible attitude, simply to satisfy her venomous nature. The defendant secured the evidence of Mr. and Mrs. I. C. Palmer, with whom the plaintiff had roomed a couple of years before her marriage. They testified that she came to their place in the fall of 1929, and had gentlemen callers who would come in automobiles and stop across the street and honk for her, and she would drive away with them. That the only one of these men who ever came into the house was a Mr. Kempfey, in whose store she worked Saturday nights. Mrs. May Palmer testified that she saw a young man making love to plaintiff, and had his arm around her and kissed her near a Christmas tree that they had outside in the yard. That on one occasion plaintiff returned at about 2 o'clock in the morning and went to

the bathroom and used a douche; that Mrs. Palmer followed her in, and said: "You get right out of my home, I won't ask you to get out tonight, but you get out tomorrow." All of these charges were denied by the plaintiff.

In the reply brief, plaintiff attacks the character and reputation of the Palmers, and says plaintiff called G. A. Steele to the stand to rebut the charges made by Palmers that he often honked in his car across the street and waited to take plaintiff out riding. Mr. Steele testified that he was 55 years of age, general manager and vice-president of the Manhattan Oil Company, and had lived in Omaha more than 17 years; that plaintiff had been in his employ for a period of a year and a half. He denied that she had ever been in his Buick coupé, or that he had ever kept company with her in any way, and denied all the statements made by the Palmers in relation to him. He admitted that he might have given the plaintiff a Christmas present of a $2.50 gold piece, as that year he gave such a present to each of the office force. However, there is evidence which shows that plaintiff accepted one or more loans of money from Mr. Steele.

In giving a glance at a few of the high spots from the 1,200 pages of evidence in this bill of exceptions, we have not gone into many unsavory details reflecting upon the standing and character of each of the litigants to this lawsuit, but have only set out small excerpts of the evidence which tended to prove the charges and counter-charges made.

It is argued by the defendant that $300 alimony is ample in this case, because she did not assist in earning any of the property.

This court recently said in *Moravec v. Moravec,* 123 Neb. 830, that even where the wife was denied a divorce she could still be allowed alimony at the time her husband procured his divorce. In this case the parties were 55 and 28 years, and each had children by former marriages. In the case of *Mann v. Mann,* 124 Neb. 639, plaintiff had

been required to pay alimony of $80 a month from December 22, 1925, until November 16, 1928, while he was earning $200 a month. These payments were cut to $60 a month when his wages dropped to $135 a month, and later were reduced, and he was finally directed to pay $35 a month for 48 months, a total of $1,680.

Many of the Nebraska cases were reviewed in the opinion in *Swolec v. Swolec,* 122 Neb. 837, showing that payments of alimony had varied from 15 per cent. to 50 per cent. of the husband's property, and it was held that a careful study should be made of the property holdings and earnings of each.

As to the defendant's wealth, there are various estimates of it, from the $25,000 suggested in the argument of his own attorney, to the testimony of plaintiff where she says he told her that in ordinary times he was worth about $250,000, but in times of depreciated stock values he told her that he probably would not be worth over $150,000.

It is insisted by the plaintiff's attorney that this statement of his wealth, made to Miss Saum before marriage, was perhaps quite reliable, for, as she would soon be his wife, there would be no motive to deceive her about his property holdings. When these statements are compared with his testimony at the time of the trial, the plaintiff's counsel insists that defendant's ability to estimate the true value of his property on the witness-stand had become entirely lost, due to the exigencies of the occasion.

Much is made of the fact that the four months' honeymoon cost $2,000, in round figures, but defendant had often told his wife, both before and after marriage, that he enjoyed an income of $500 a month from his investments, so this wedding trip, which was not solely for the pleasure of the plaintiff, as defendant's counsel indicates, but which the defendant also enjoyed, at least for the first three months, until he heard his business needed him in Omaha, did not make any inroads on his principal. The defendant's holdings seemed very difficult to arrive at, and his

testimony, viewed in a fair way, and putting it mildly, offered little helpful assistance in finding what his property consisted of, or what its actual value might be at the time of the trial.

Among the defendant's holdings is a fine, improved farm, of 147 acres, in Thurston county, Nebraska, located right on the edge of Pender. The farm is level and nice land, and was assessed the year before the trial for $14,115, and in some years had rented for cash rent of $1,000. Defendant testified under oath that this farm was not worth anything at all. Doubtless a very conservative estimate of the value of this farm would be $15,000.

Without considering for any purpose the fact that plaintiff testifies that defendant told her he usually kept $5,000 in a safety box, and had a checking account, which ran at one time around $1,800, and had a good automobile, and a fine diamond ring, and considerable personal property, in the furnishings of his home and elsewhere, it may disclose the wide gulf between the value of several items of his property as set out in the evidence, or as argued by the attorneys for the respective litigants, to list some of the items of defendant's property, with the values assigned by each side:

| Description of property | Plaintiff | Defendant |
| --- | --- | --- |
| The Pender farm, 147 acres | $15,000 | $4,900 |
| Home at 3022 Lafayette Avenue, Omaha | 4,000 | 2,000 |
| ½ interest in house, 3018 Lafayette Avenue | 3,000 | 750 |
| House at 2141 Newport Avenue | 2,750 | 2,000 |
| Two-story brick building, northwest corner 16th and Clark, assessed at $6,600 | 5,000 | ? |
| Carmen Distributing Co., mortgage | 6,500 | ? |
| Meisner College, first mortgage | 2,700 | ? |
| Sioux City Laundry, mortgage | 6,000 | ? |
| Wright residence, first mortgage | 2,675 | ? |

| | | |
|---|---|---|
| Emerson Laundry, second mortgage | 4,000 | no value |
| Deer Park Blvd. property, second mortgage | 1,400 | worthless |
| Indiana Limestone | 5,000 | valueless |
| Lincoln county drainage bonds | 2,000 | valueless |
| Mortgage Bank of Chile | 2,000 | 160 |
| Argentine bonds | 3,000 | 1,200 |
| Cacuca Valley bonds | 2,000 | 150 |
| German Central Agricultural Bank | 1,000 | 400 |
| Medina Temple bonds, Chicago | 2,500 | valueless |
| Low-Barcade-Hall bonds, Minneapolis | 2,000 | valueless |
| 10 shares, Union Stock Yards | 1,000 | 700 |
| 25 shares, Moody Investment Service | 2,500 | worthless |
| 50 shares, American Colortype | 5,000 | 100 |
| 50 shares, Standard Oil, Nebraska | 5,000 | 700 |
| 25 shares, Southern California Edison | 2,500 | 350 |
| 35 shares, Fairmont Creamery Co. | 3,500 | 2,200 |
| 13 shares, Insuranceshares of Delaware | 1,300 | 20 |
| Abe Lincoln Copper Co. | 1,250 | worthless |
| 16 shares, Thompson-Belden Co. | ? | ? |
| Totals, | $94,575 | $15,630 |

The true value doubtless lies somewhere between these estimates, and the average of the two estimates would be about $55,000. If defendant had died while on the wedding trip, the plaintiff would have been entitled, as a second wife, to one-quarter of this property, or $13,750.

With this brief statement of the property holdings, we will now consider the law applicable thereto. The defendant calls our attention to several cases which were not discussed in the case of *Swolec v. Swolec, supra.* In *Zimmerman v. Zimmerman,* 59 Neb. 80, the referee recommended alimony of $3,000, the property being all accumulated by the husband prior to their marriage, and this court reduced the alimony to $2,500. In *Isaacs v. Isaacs,* 71 Neb. 537, the wife left the same year they

were married, and refused to return to her husband, although he offered to do anything that was within his power to make a home for her. The court held that he was not required to dispose of his farm in Wayne county, Nebraska, and move to Ohio because she preferred to live there, and that her refusal to live with him constituted desertion. The court held that, where a wife, absolutely without cause, refuses to live with her husband, and has not helped to accumulate any of his estate, and he obtains a divorce on the ground of desertion, she is not entitled to alimony.

In *Price v. Price*, 75 Neb. 552, a widower with children married a widow with children, and relatives interfered to make conditions intolerable for the wife, and she took her children and moved to a home that she owned in Grand Island, where she put her children in school, and the defendant frequently came and stayed with her temporarily. She always agreed to come back and live with him if he would provide a proper home. The defendant was earning $50 a month, and was the owner of personal property of the value of $500, and the court directed that he pay his wife $100 a year for her support and maintenance until he provided a suitable and proper home in which she could live with him.

In *Brewer v. Brewer*, 79 Neb. 726, a 22-year-old boy secretly conveyed his property to his mother just before marrying a 19-year-old girl, and the mother arbitrarily assumed the management of the home. The young wife refused to stay under such tutelage, and this court held that she was entitled to separate support and maintenance under those conditions.

The nearest case in point cited by defendant's counsel from Nebraska is *McKee v. McKee*, 2 Neb. (Unof.) 322, in which Commissioner Pound reviewed six Nebraska cases relating to the amount of alimony allowable, and held that the court should consider the financial standing of the parties, the duration of their marriage, the value of the husband's estate, and the source from which it

came, and how far, if at all, the wife had contributed thereto. The plaintiff in the case was the defendant's second wife, and was in robust health, had supported herself before her marriage, and was able to support herself after her divorce. She brought little, if anything, in the way of property, and the district court granted her a divorce on the ground of extreme cruelty, with alimony of $1,500, and $150 attorney's fees. The principal item owned by the defendant was a farm of 120 acres, the average estimates of value being about $35 an acre, making it worth $4,200, and he owed $1,000, leaving a net value of the husband's holdings of $3,200. Commissioner Pound says: "Taking the whole testimony together, however, remembering that she has received all the household goods that she cared to take, we are constrained to think that the award of $1,500 alimony, coupled with $150 for attorney's fees is too much;" and cut the award to $1,000, which, including the household goods she had received, gave her approximately one-third of his property.

In the case at bar, criticism is made that the plaintiff is a "gold digger," and was simply marrying an old man for his money, but the evidence clearly convinces us that the aggressive courtship put on by the defendant indicates that he was fully as anxious as she was to consummate the marriage. The trial court, in finding that she was entitled to a divorce, must have considered that defendant's deceit in concealing his former relations with Thelma Holman entirely justified the plaintiff in leaving him, and plaintiff decided, as was her right, that she did not desire to forgive this wrong and go back to him. We can find no precedent in this state, under the evidence in the case at bar, for cutting plaintiff off with alimony of but $300 and attorney's fees of $700, after deciding she was legally entitled to a divorce. Prior to their marriage he made her a beneficiary under life insurance policies to the amount of $6,000. He very promptly settled the Holman threat of suit for $5,000 cash. In case

of his death while on the wedding trip, plaintiff would, under the law, have received one-quarter of his estate, no antenuptial agreement being mentioned, together with the life insurance he had transferred to her.

Considering all of the evidence, including his courtship and their legal marriage, together with the charges and countercharges on each side, we decide that alimony in the sum of $6,500 is amply justified in this case. The attorneys for plaintiff have already received very liberal allowances in the way of temporary and permanent attorneys' fees, but an allowance of an additional $500 is made for services in this court. As thus modified, the decree is affirmed.

AFFIRMED AS MODIFIED.

The following opinion *in re* costs was filed April 27, 1934. *Cause remanded for taxation of costs.*

PAINE, J.

In this case, we are brought face to face with sharp and insistent objections to the charges made by the court reporter for the bill of exceptions.

On June 23, 1933, John A. McKenzie, one of the attorneys for the plaintiff, filed an affidavit in the supreme court, asking that the defendant be required to pay to the clerk of the district court the approximate cost of

bill of exceptions, $550; of transcript, $10; appeal bond, $10; filing fee in the supreme court, $20; approximate cost of printing briefs, $50; being a total of $640, in order that the plaintiff might appeal her cause to the supreme court.

On June 26, 1933, William R. Patrick, attorney for the defendant, filed his affidavit in this court in opposition thereto, especially attacking the cost of the bill of exceptions, estimated at $550, and "says that William F. Milotz, the official court reporter in said trial in the district court, persisted in taking down in shorthand all of the argument presented by counsel pro and con upon motions or objections in relation to the reception and introduction of evidence."

In the brief of defendant, paragraph VII is entitled, "Inflation of the Record and Reporter's Fees," and reads as follows:

"This court by order required defendant to pay for the bill of exceptions—'at legal rate.' The inclusion of a large amount of extraneous matter therein, with a demand for compensation greatly exceeding the statutory fees, raises the issue as to what may be included in the record, and collected for. The reporter first demanded $490, but subsequently conceded that the record does not exceed 251,976 words, but arbitrarily added $61.15 for 'indexing and numbering.' * * * Defendant paid $377.96 under protest and upon stipulation that further payment or refund, as case may be, will be made in accordance with this court's determination. * * * No direction or request for recording additional matter was made, but the reporter wilfully persisted in recording argument of counsel, extended remarks of court, and other irrelevant and improper matter, for which he seeks to mulct defendant.

"Preceding the taking of testimony a motion, previously filed, to strike a large portion of plaintiff's amended petition was argued and disposed of, and the argument thereon, and the discussion of the court sustaining said motion fills the first forty pages of the record."

In response to these charges, William F. Milotz, the official court reporter, has filed a printed brief in this court in his own behalf. In this brief he first sets out section 27-337, Comp. St. 1929, which provides as follows: "Duties of Reporter. The said reporter shall attend all terms of the district court held within and for the district for which he is appointed, and shall make a stenographic report of all oral proceedings had in such court, including the testimony of witnesses with the questions to them, verbatim, and any further proceedings or matter when directed by the presiding judge so to do, or requested by either party to said proceeding, and when requested at the beginning or during the progress of the trial by any party to the proceedings all comments and statements made by the judge in the presence of the jury shall in all cases be taken down and recorded by said reporter; but the parties may, with the consent of the judge, waive the recording by such reporter of any part of the proceedings herein required to be taken; this shall not include arguments to the jury. And whenever, during the progress of the cause, any question arises as to the admissibility or rejection of evidence or any other matter causing an argument to the court, such argument shall not be recorded by the reporter, but he shall briefly note the objection made and the ruling of the court thereon, and any exceptions taken by either party to such ruling."

This section of our statute has not been amended in many years, and there has rarely arisen any dispute over these provisions. We admit the language could be clarified, for it says he shall make a stenographic report of *all* oral proceedings, and then proceeds to say that, after taking the testimony of witnesses verbatim, and all the comments of the judge in the presence of the jury, he need not take other proceedings unless directed by the presiding judge or requested by the parties. It specifically says that arguments on the admission or rejection of evidence *shall not* be recorded.

The first 40 pages of this bill of exceptions is a ver-

batim record of objections to the pleadings, with copious citations therefrom. No witness was upon the stand, and this 40 pages consists simply of efforts of counsel to amend pleadings, the argument pro and con, and the running observations and remarks and rulings of the court. The first paragraph reads as follows: "Mr. Patrick: If the court please, there is a motion that I think should be presented this morning before we proceed further. For the convenience of your honor I will let you have our copy which I have marked up somewhat. The motion is to strike from the plaintiff's amended petition the following portions thereof which appear to be irrelevant, redundant and immaterial matter."

We have been unable to find any law requiring the reporter to take in shorthand such informal discussions of the pleadings which occur in advance of the trial. We therefore come to the conclusion that if the reporter voluntarily takes them they cannot be written up as part of the bill of exceptions for which an unwilling litigant can be compelled to pay under our statute.

Again, defendant's counsel, in support of his charge that the court reporter is forbidden to report the arguments arising upon objections made in the taking of the testimony, cites us to *Clough v. State,* 7 Neb. 320, where Judge Lake, when considering objections to an 1,100-page bill of exceptions, which he said was double the quantity actually necessary or proper, made use of the following language:

"For instance, there is page on page taken up with the arguments of the respective counsel on the numerous questions constantly raised during the trial as to the admissibility of testimony, and also with the remarks of the court in assigning reasons for the rulings thereon, all of which serve no useful purpose, but tend materially to encumber and obscure the record, and to increase the expenses of a trial far beyond what is legitimate. * * *

"It not unfrequently happens that quite lengthy arguments are made by counsel on questions thus raised, and

·in deciding them the judge may see fit to give elaborate reasons for his decisions, but neither of these has any business whatever in the record, nor should the stenographer be permitted to encumber his report with them, when it can only result in augmenting his compensation, with nothing valuable given in return."

It appears clear that a reporter should not take down, and, certainly, if taken down, should not expect pay for transcribing, the entire arguments upon the objections to the introduction of evidence.

Now, in regard to the amount to be charged for the proceedings which are authorized to be taken, we have section 27-339, Comp. St. 1929, which reads, in part, as follows: "It shall be the duty of such reporter to furnish on the application of the county attorney, or any party to a suit in which a stenographic report of the proceedings has been made, a longhand copy of the proceedings so recorded, or any part thereof, for which he shall be entitled to receive in addition to his salary, a fee of fifteen cents per hundred words, to be paid by the party requesting the same; except, where such copy is required by the county attorney, his fee therefor shall be paid by the county in the same manner as other claims are paid."

In considering that portion of the charges of the court reporter, $61.15, for indexing and numbering 1,223 pages, being five cents a page, we find no statute allowing this charge. In the supreme court rules, section 9a covers the preparation of the transcript by the clerk of the district court, and, inadvertently, a portion of a sentence is inserted there reading, "and the questions in the bill of exceptions to be numbered." This should, of course, be in paragraph 9b, covering the bill of exceptions. Doubtless no attorney would object to the reporter numbering the interrogatories in the bill of exceptions and charging for each blow of a numbering machine as one word, but in examining this bill of exceptions many a page has only one question, and rarely any page more than ten such

numbers. The index required by the rules of this court could, of course, be counted and charged for as allowed by statute. These three volumes are "bound" by placing a piece of Manila paper on each side and running three extra long brass staples through the top. It is the simplest and most convenient way in which the reporter can arrange the sheets for delivery. Some reporters are requested by attorneys to have the bill of exceptions bound in cloth or boards in a permanent manner which reflects credit upon both parties, and the actual cost of such binding would willingly be paid by the counsel ordering the same, but cannot be collected under the law from a litigant unwilling to pay for the same. I find that Justice Sedgwick had a similar matter before him in the case of *Pettis v. Green River Asphalt Co.*, 71 Neb. 513, 519, and determined that the necessary expense of settling a bill of exceptions upon the determination of a cause in the district court is taxable as costs incurred in that court, to be adjudged against the unsuccessful party in the final determination of the litigation, and, therefore, following this precedent, this court can determine whether the statute has been followed in the amounts charged, but the costs of settling the bill of exceptions must be taxed in the district court. If any extra compensation, in addition to that allowed to him by the statutes herein cited, is thought desirable by the official reporter, in addition to his salary of $2,750 a year (Comp. St. 1929, sec. 27-336) such relief should be secured through the legislature, and not through the courts.

We have gone through the 1,223 pages of the bill of exceptions in this case twice, page by page, and find that many pages consist of arguments upon amending the pleadings and arguments upon the objection to the introduction of evidence, including cross-table discussion between counsel, and that such record is not a proper or necessary part of a bill of exceptions which a litigant can be compelled to pay for over his objection, and that there are 12,000 words of such record, after allowing

credit for the index pages, which had not been counted, and deducting this amount from the total number of words by actual count, stipulated in the bill of exceptions to be 251,976, leaves 239,976 words which, at 15 cents a hundred, amounts to $359.96, which should be taxed in the district court as the cost of the bill of exceptions.

REMANDED FOR TAXATION OF COSTS.