RUTH C. MUNSELL, APPELLANT, V. CARLOS W. MUNSELL, APPELLEE.

24 N. W. 2d 566

FILED OCTOBER 11, 1946. No. 32076.

*David D. Weinberg* and *Thomas J. Sheehan, Jr.,* for appellant.

*Boyle & Boyle,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, and CHAPPELL, JJ.

PAINE, J.

Plaintiff was granted an absolute divorce on her petition alleging extreme cruelty, and was awarded as alimony the equity in a house at 3346 North Fifty-fifth Street, Omaha, together with all furniture and household goods, of the value of $1,200, and permanent alimony of $750, payable at the rate of $50 a month, beginning December 1, 1945, together with her attorney fees, in the sum of $150, and costs. The court awarded the defendant the house located at 3732 North Fifty-third Street, Omaha, in which there is an equity of $1,300, and the Buick automobile, of the value of $800.

From this decree the plaintiff appeals, setting forth 21 assignments of error, which may be briefly summarized as follows: That the evidence does not sustain the findings

that plaintiff had on deposit only $95.42 in The Omaha National Bank, and thereafter deposited only $1,329.02 in said bank; error in finding that all the deposits in the Douglas County Bank were the earnings of defendant, except $800, proceeds from sale of automobile, and in finding that defendant contributed $12,500, from which the real estate was acquired. Plaintiff denies that there is any equity in the house given her in the decree, or that the furniture is worth $1,200. Plaintiff alleges that the award of only $750 permanent alimony is insufficient under the evidence, and she is entitled to a much larger sum; that the court erred in awarding the house described herein to defendant, and requiring her to surrender possession to him within 15 days, as such an order is unjust and inequitable.

It will be seen that practically all the main assignments of error relate to the distribution of their assets between them and to the amount of alimony allowed plaintiff. It may be said that the evidence pro and con relating to various acts of cruelty, their very unhappy home life, and the serious charges each makes against the other, engendered considerable feeling between the litigants and also their counsel, but such evidence will not be reviewed in this opinion, although a reading of it satisfies this court that plaintiff was entitled to the absolute decree of divorce granted by the trial court.

It appears that the defendant met the plaintiff for the first time some three weeks before their marriage, which took place on March 9, 1938, which was seven weeks after the plaintiff's second husband was killed, and they lived together for a little over seven years, and separated in June 1945. No issue was the result of this marriage, but the plaintiff had two daughters, the older one being named Ruth, the same as the mother, who married a service man on September 6, 1943, who went to the South Pacific, and she lived with the plaintiff and defendant at times, receiving allotments from this marriage, and her mother stated that she paid board from such allotments. This daughter

testified that once she called the police when her stepfather was striking her mother. She testified as to differences between them over their cars and the use of their cars.

The younger daughter of the plaintiff was Kathryn, who had been living at Fort Dodge, Iowa, with her older sister, but they both came back to live with the mother a week after she was married to defendant. Kathryn testified that she was 17 years of age, that she was married but that marriage was annulled, probably by her husband's folks, on June 9, 1945, and then she married a young man named Kaiser on June 20, 1945, and she testified that she moved back home with Kaiser and they lived in the basement, but that she is now separated from Kaiser.

This court has established certain rules which may be used as a guide in fixing a reasonable amount of alimony to be given in case a divorce is granted. These rules may be found set out in detail in Swolec v. Swolec, 122 Neb. 837, 241 N. W. 771, Phillips v. Phillips, 135 Neb. 313, 281 N. W. 22, Hild v. Hild, 135 Neb. 896, 284 N. W. 730, O'Donnell v. O'Donnell, 142 Neb. 706, 7 N. W. 2d 647, Lippincott v. Lippincott, 144 Neb. 486, 13 N. W. 2d 721, Vocelka v. Vocelka, 146 Neb. 268, 19 N. W. 2d 363, and Haussener v. Haussener, ante p. 489, 23 N. W. 2d 700. From these and other decisions of our court, many facts should be taken into consideration in fixing the amount of alimony.

The case at bar comes within the third class of cases discussed in Phillips v. Phillips, *supra*, where the parties are mature when they are married, one or both have been married before, and have no issue from the union, and separated after a few years of unhappy married life.

In fixing the amount of permanent alimony, the court will take into consideration the age of each party at the time of the marriage, the estate which each party had at that time, together with their respective contributions, as well as the earning ability of each during their marriage and also at the time of the decree, their condition of health,

their station in life, the duration of the marriage and the conduct of each during said period, the value of their financial holdings at the time the decree is granted, as well as the wife's loss of interest in the husband's property, together with all other facts and circumstances which have been brought out in the trial, and award such alimony as appears to be fair and equitable between the parties.

As was stated in Swolec v. Swolec, *supra,* "there has never been an attempt by this court to fix any rules which would relieve the trial judge of a patient, detailed study of every fact and circumstance relating to each case as it comes on for trial."

In an effort to arrive at the assets and earnings of the respective parties in the case at bar, we have examined the bill of exceptions, of nearly 300 pages, and the exhibits of bank statements and about 100 checks offered in evidence, in an attempt to arrive at some kind of a trial balance of their financial affairs.

We find that the bank account of the Douglas County Bank, being exhibit No. 3, runs only from August 16, 1944, to May 14, 1945, during which nine months there was deposited some $1,776, which was checked out and the account was closed. Next, there appear five pages of the bank account in The Omaha National Bank of the plaintiff under her former name of Ruth C. Schnack, and these bank statements cover five months, from January to May of 1938, part of which time was prior to her marriage; but this account shows that her balance in this account on the date of their marriage, March 9, 1938, was $95.42.

Any attempt to set out receipts and expenses of the plaintiff is further complicated by the testimony of the plaintiff, her daughters, and her mother that she kept sums of money, ranging from $400 to $800, hidden around the home, under the rugs and in various other places, and the plaintiff testifies that she gave $800 of this hidden money at one time to the defendant, which he absolutely denies.

There is introduced as exhibit No. 2, on a sheet of post-office letter paper, items of two accounts of savings in the United States Post Office, in which are shown total deposits of $1,504. The largest of these deposits is $580, which is marked in lead pencil as Ruth's allotment, probably received from the government, and $290 as part of down payment on Ruth's house.

The other lead pencil memorandum on this exhibit No. 2 purports to show items of money the plaintiff made working various places after the marriage, as follows: In September 1942, working at Father Flanagan's, $20; February 1, 1943, working at the Brandeis Store, $50; board money from Ruth in 1943, $20; money earned for caring for children, $135; in 1944, operating elevator, probably at the Fontenelle Hotel, $90. There is also another item, May 19, 1944, of $100, "bond money & Carl kept rest." There is $19 in another account reading, "Kays money for train fare deposited in my name."

It would appear that possibly $315 of these post-office savings account items would be money the plaintiff earned and brought into the family funds during the marriage. We can find no sufficient proof for any other sums she claimed to have earned during marriage.

We will now endeavor to estimate what the plaintiff had at the date of the marriage.

From the proceeds of the case handled by George Boland, she received $1,000 in cash and $500 in payments at the rate of $25 a month, total............................................$1,500
But in the stipulation it is shown that out of the last sum she paid the undertaker ............................................$423.37
attorney fees, George Boland,...... 250.00
and for Ruth's operation ............ 150.00

823.37

leaving a net amount of only...................... $676.63

She also received upon the death of her husband, from the Metropolitan Life Insurance Company ........................................................................$1,200.00

Mutual Benefit Life Insurance Company................. 1,000.00

Balance in account, The Omaha National Bank, on March 9, 1938............................................... 95.42

Plaintiff claims to have had in cash March 9, 1938 400.00

Plaintiff claims to have sold her furniture to her mother for ........................................................ 400.00

She owned a Ford, traded on a bill to paint their house after marriage at ................................... 125.00

Plaintiff's miscellaneous earnings during marriage, as deposited in post-office savings account 315.00

$4,212.05

In addition, she gave defendant at the time of their marriage, to pay his debts............................. 290.00

Total amount plaintiff brought into the marriage partnership ...............................................$4,502.05

On the other hand, the defendant introduces exhibit No. 27, which purports to show his earnings as a bus operator for the Omaha & Council Bluffs Street Railway Company for each year beginning with the year 1938 up to and including the time they separated in June 1945, and that his earnings during those years were $15,061.55. If the earnings for the full year 1938 were $1,489.98, as shown in exhibit No. 27, about one-fifth of this year's earnings was earned before the parties were married, and deducting that amount leaves the total amount of his earnings during their marriage as $14,763.56. It appears from the evidence that he was paid twice each month; that when he got his checks he handed the same to his wife, who cashed them; that he never had a bank account, rarely went to the bank with her; that she kept the bank accounts in her name, as shown by the exhibits introduced, and handled all of the money, except possibly a few items, and his evidence discloses that

he knew little, if anything, as to how their financial affairs were managed.

During their marriage they owned nearly half a dozen different second-hand automobiles. His interest in cars is shown by his giving evidence of the exact price paid when one was purchased, of the amount they received as credit from the car traded in, and his recollection of automobile deals was much more definite than any other testimony he gave in regard to financial matters.

At the date of his marriage he had an equity in a house at 4113 South Forty-first Street, which he had bought on a contract, but he made no payments on it after they were married and just let it go. He had a Packard roadster at the time he was married, for which he later was given a $150 credit when it was traded in on a 1935 Oldsmobile coach after they were married.

To summarize the defendant's situation:

He earned during marriage ............................$14,763.56
He owned a Packard roadster, traded in for......... 150.00

$14,913.56
He owed debts his wife paid off on marriage......... 290.00

Net assets defendant brought into the marriage
partnership ..........................................................$14,623.56

As there was no attempt to introduce the bank statements and checks for the remaining period of over six years, it is impossible to trace all the other financial transactions between these parties during their married life.

It appears that they bought the usual furniture for their home, and usual kitchen equipment, and it does not appear that the bills for the upkeep and living expenses were extravagant.

The greater portion of the earnings of each of these parties was spent, and when the decree of divorce ended the partnership there were very few assets remaining to

show for the $19,000 which had been handled in their seven years and three months of married life.

In the case at bar, several assignments of error relate to awarding the plaintiff the house at 3346 North Fifty-fifth Street. It is charged that there is absolutely no equity in this house. Now, what does the evidence show in regard to this matter?

The plaintiff and defendant purchased this real estate from George W. Platner and wife on October 15, 1943, for $3,250, paying $250 in cash, the balance payable at $30 a month, with 6 percent interest. On February 15, 1945, the plaintiff and defendant sold this property to the plaintiff's older daughter, Ruth C. Matejka, for $3,200, as shown by exhibit No. 25, in payment for which she paid $35 in cash and gave a note for $3,165, payable at the rate of $35 a month, but these exhibits do not disclose all of the facts testified to, for the defendant testified that this place was actually sold to the daughter for $3,850, and that Ruth paid them $550 in cash from her allotment by paying that amount on a gas furnace which was installed in the house where the plaintiff and defendant lived, which house is given to the defendant by the decree, and that the contract was made for only $3,200 for the reason that if the profit of $600 was shown they would have to pay income tax on it. The defendant on direct examination replied to a question: "A—That was in the contract, but the original agreement was she was to pay $3850. Q—Why didn't they show $3850 in the contract? A—Because you have to pay so much income tax on any profit made on the property, and the Missus didn't want it that way so she would have to pay income tax. Q—So to dodge the income tax the consideration was put down at $3200? A—Yes, sir." The defendant made no objection to this deceit.

Although the daughter Ruth had agreed to pay $35 a month and the payments under the original contract to Platner were only $30 a month, it is still impossible for this court to determine whether there is an equity in the house

itself awarded to the wife, which has been sold to the daughter on this contract, because of the several conflicting statements in the testimony in regard to it.

Another instance of alleged deception is charged by the defendant in the plaintiff testifying that she sold furniture, which she had at the time of her marriage, to her mother for $400 cash, and we have accepted her evidence on this item and have given her credit for that $400 cash herein, but the defendant charges that at the time of this marriage this furniture was mortgaged for $168, which was never paid out, and that she surrendered the furniture to the mortgagee.

It is proper for the court to take into consideration the condition of health of the parties in a divorce action, as shown by the evidence. The defendant is a healthy, able-bodied man, working steadily. The plaintiff charges in her brief that such cruelties were inflicted upon her by the defendant that she is now broken in health. We have examined with care the evidence relating to this matter. Kathryn testifies that her mother would get very nervous and become almost hysterical at times. The mother of the plaintiff testified that she was in good health at the time she married the defendant but by 1944 the plaintiff was very thin, had been very ill, and had undergone an operation, doubtless referring to an abdominal operation, and that she was nervous and upset over the breaking up of the home. The doctor who had been treating plaintiff operated on her a few days before the trial for varicose veins. He testified that she had lapses of memory and she would not know what she was doing; that she seemed to have a form of epilepsy; that she had tried different kinds of jobs, but had difficulty in continuing with any job. He testified that she would require further treatment for her nervous condition and for her varicose veins. The doctor was asked whether the fact that the plaintiff's sister was in an insane asylum, and more distant relatives were also afflicted men-

tally, would change his opinion, and the doctor testified that it would not, and added: "The cause of it I don't know, but I say the conditions under which she was living most certainly aggravated her condition." The evidence discloses that the plaintiff is mentally and physically impaired.

It is impossible, from a reading of the evidence in this case, to arrive at a satisfactory solution of the financial troubles between the plaintiff and the defendant. We have reached the conclusion that the plaintiff may have brought into this marriage partnership something less than $4,500 and the defendant has brought in some $10,000 more than that, and the greater part of these sums have been spent in living and automobile expenses.

The parties were married in March 1938, and the defendant testified that a few months later he adopted the plaintiff's two daughters, Ruth and Kathryn, who were at that time eleven and nine years of age, so that the money which he brought into the family also furnished the plaintiff's daughters with food and lodging and something of an education, which the plaintiff would not have been able to give her daughters without these earnings of the defendant.

An examination of this record forces us to the conclusion that the defendant, with a steady job and with a good salary, has been too liberally treated by the trial court, which gave him their home, which had an equity of $1,300 in it, and the Buick automobile, with a value of $800, and required him to pay but $750 alimony, at the rate of $50 a month until the same is paid, together with $150 attorney fees.

We modify the decree of the district court by raising the allowance of $750 to $1,250, payable at the rate of $50 a month, the first payment to be due and payable when judgment is entered on our mandate, and the succeeding payments monthly thereafter on the same day of the month, and award plaintiff's attorneys an additional $150 for their

services in this court, and as so modified the decree of the district court is affirmed.

AFFIRMED AS MODIFIED.

Wenke, J., participating on briefs.