BETTY ANN PETERSON, APPELLEE, v. JOHN FRANCIS PETERSON, APPELLANT.

41 N. W. 2d 847

Filed March 23, 1950. No. 32748.

*Hamer, Tye & Worlock,* for appellant.

*Minor & Minor,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff was granted an absolute divorce from defendant upon the ground of extreme cruelty, and awarded $4,500 permanent alimony, payable $75 a month beginning October 1, 1949, and continuing until paid in full. Defendant's motion for new trial was overruled, and he appealed, assigning as error solely that the judgment for alimony was excessive under the evidence, and was an abuse of judicial discretion. · We affirm the judgment of the trial court as modified.

An appeal lodged in this court from a decree rendered in a suit for divorce brings the case here for trial de novo upon the issues presented by such appeal as in other equity actions. Section 25-1925, R. R. S. 1943; Westphalen v. Westphalen, 115 Neb. 217, 212 N. W. 429; Lippincott v. Lippincott, 141 Neb. 186, 3 N. W. 2d 207, 140 A. L. R: 901.

This court has held that: "Permanent alimony is founded upon the right of the wife to such support from her husband as she would be reasonably entitled to

expect, considering all of the circumstances. Its amount rests upon the sound discretion of the court." Swolec v. Swolec, 122 Neb. 837, 241 N. W. 771. It has also been held that: "Whether a wife should be granted permanent alimony, where there is no accumulated property from the marriage, is not a question solely of the necessities of her situation, but equally one of fairness and justice, as between the parties, under all the circumstances." York v. York, 138 Neb. 224, 292 N. W. 385. See, also, Barton v. Barton, 126 Neb. 835, 254 N. W. 561.

It has been generally held that in the division of property and allowance of alimony in a divorce action, the court, in the exercise of judicial discretion, should consider the estate of the parties, if any, at the time of the marriage and their contributions since; the duration of the marriage; the wife's loss of interest in the husband's property by virtue of the divorce; the social standing, comforts, and luxuries of life which the wife would probably have enjoyed; the conduct of the parties leading up to the divorce; to which party the divorce was granted; the age, condition of health, and earning ability of the parties; and all other relevant facts and circumstances; and make such award as appears to be fair and equitable. Marquardt v. Marquardt, 151 Neb. 583, 38 N. W. 2d 403; Wade v. Wade, 149 Neb. 502, 31 N. W. 2d 420; Green v. Green, 148 Neb. 19, 26 N. W. 2d 299; Haussener v. Haussener, 147 Neb. 489, 23 N. W. 2d 700; Munsell v. Munsell, 147 Neb. 590, 24 N. W. 2d 566.

In the light of the foregoing principles, we have examined the record. Plaintiff, 20 years of age, a high school and business college graduate, lived in Kearney with her parents, while employed at the Kearney Air Base in a secretarial capacity, with civil service rating of $2,799 a year. There she met defendant, a captain, A. U. S., only living child of his parents, 27 years of age, 6 feet 1 inch tall, a high school graduate with 3 years college training at William and Mary. After an arduous courtship from March 13 to December 3, 1948, they be-

came engaged. They were to be married sometime in April. However, four times, at defendant's insistence, the marriage date was advanced, and they were married on February 5, 1949, at an invitation church wedding in Kearney. In the meantime, defendant had told plaintiff, or plaintiff and her parents, that he owned $7,000 or more in bonds, approximately enough so that he could pay cash for a home they contemplated buying for $8,250, but that he preferred getting a G. I. loan; that he had $30,000 life insurance, of which he intended to make plaintiff the beneficiary; and that he would inherit one-half million dollars from his parents. He also told plaintiff after the marriage, while they were in California, that he had talked with his father about signing some of the bonds over to plaintiff.

At the trial, however, on June 25, 1949, defendant admitted that he told them he had $7,000 in bonds, which "was slightly exaggerated," since he did have approximately that much in bonds two years ago, purchased for him by his mother out of monthly allotments of $125 from his pay while overseas, but that he had spent it all, "especially in the last four months," and that he was then in debt and without any money. He also testified that he had only $10,000 of life insurance, and inferentially belittled his parents' wealth. He further testified that he owned an automobile which he was paying for by the month. Plaintiff testified that at the time of the marriage she knew that defendant had an allotment of $75 each month taken from his salary, which was sent back to San Diego and put in his savings account.

Both parties liked athletics, and during the courtship they swam, bowled, danced, and attended numerous social functions. Approximately six months prior to the marriage, however, defendant was informed that plaintiff was diabetic, which apparently did not affect her health or activity. Thereupon, defendant entered no objections but made a study of diabetes. He consulted with physicians relative to plaintiff's health and her ability to bear

healthy children. Prior to the marriage he went to the base hospital at Kearney and talked with a physician. There, at defendant's request, insulin was requisitioned through the army base for plaintiff. Plaintiff, prior to the marriage, left her employment, withdrew her retirement pay, and spent approximately $600 in preparation for the wedding. Some of the debts for the wedding were not yet paid at the time of the trial.

After the marriage ceremony on February 5, 1949, they left for a planned three-weeks honeymoon in San Diego, California. The trip was a very happy one and they arrived at the home of defendant's parents in San Diego on February 8, 1949. While there plaintiff visited with defendant's parents daily, but left the home with them only once and met only one of defendant's friends. However, defendant was considerate and affectionate as usual, and they were happy for a few days. Then he became a "changed person" and on February 15, 1949, told plaintiff that they should return to Kearney because "he wasn't happy about our marriage; he thought we should get a divorce;" that "we were not suited for each other." He also mentioned her health. In that regard, his own testimony was: "Part of my decision to cancel the marriage was because life in the military service is rather fast and rather active, and I didn't think that Betty would actually fit into that fast-moving life as well as some people might." Plaintiff's persistent pleas that he reconsider met with absolute refusal, and on February 16 they started back to Kearney. Contrary to plaintiff's wishes, defendant's mother accompanied them. As stated by defendant, "I brought my mother with me because Betty was very upset, and I was afraid that she might try to do something which would be very serious, and I wanted my mother there as a buffer." Upon their arrival, defendant's mother stayed in Kearney one night at a local hotel, and left for San Diego the next day without seeing plaintiff again.

During the course of the return trip, defendant refused

to live with plaintiff, and she occupied a room with his mother. Upon their arrival in Kearney on February 19, 1949, he took plaintiff to the home of her parents, where he told them, "it was a bad deal," that he "had decided to call it off," that "that was the way it was going to be, —that was all there was to it." There she was left by him, and although plaintiff continuously thereafter up until the time of the trial sought a continuance of the marriage relation, defendant refused.

Prior to the marriage plaintiff and defendant had rented and furnished an apartment in Kearney. After their return, he refused to permit her to live there. Without plaintiff's knowledge he sold the furniture in the apartment, except that personally belonging to plaintiff, and kept the money. However, he stayed in the apartment and used plaintiff's furniture until he was presently transferred to a Texas air base. Before leaving for that assignment, he told plaintiff, "If you don't put in for a divorce, I will go down to Texas and set up a residency and get one myself." Therefore, on February 24, 1949, plaintiff filed this action.

During the trip to San Diego defendant gave plaintiff $15, and upon their return, before this action was started, he gave her $100 at one time and $105 at another with which to reinstate her civil service rating and retirement pay. Upon her return to Kearney plaintiff was without dispute grieving, nervous, sleepless, depressed, humiliated, and embarrassed in the presence of friends and former fellow employees. Therefore, on March 22, 1949, she accepted employment at Offutt Air Force Base in Omaha, with the same rating. There, without sufficient funds of her own, and in debt, the disaster befalling her marriage impaired her health and efficiency.

Defendant testified at the time of the trial that he was then receiving as captain's base pay at least $253 a month, which was to be increased 5% by longevity in August 1949. He was also admittedly receiving at least $21 a month sustenance allowance for himself, and since the

marriage has drawn an additional $111 a month for sustenance and quarters by reason of the marriage. In that regard, on February 25, 1949, by stipulation, defendant was ordered to pay plaintiff $100 suit money and $100 a month, beginning March 1, 1949, as temporary alimony while she was unemployed, to be reduced to $75 a month upon her employment. Since her employment began on March 22, 1949, defendant paid her only $75 for that month, and has paid $75 a month since. We call attention to the fact, however, that the difference between $111 received by him because he was still married, and $75 paid to plaintiff, was $36, representing a net monthly profit for him resulting from the marriage. The final decree, which awarded plaintiff $4,500, payable $75 a month, was not superseded and defendant still continues to receive such profit.

The record discloses that plaintiff did her full marital duty, and was entirely blameless. Only defendant's undisputed, inexplicable cruelty destroyed the marriage, depriving plaintiff of its compensations, undermining her health and efficiency, and leaving her an unhappy and disillusioned young woman.

We are convinced that defendant at the time of the trial still had approximately $7,000 or more in bonds. His simple explanation that he had spent it lacks any corroboration or credence. Fairness and justice demand that he pay plaintiff one-half their value, or $3,500, as permanent alimony.

For the reasons heretofore stated, we conclude that the judgment of the trial court awarding plaintiff alimony should be and hereby is modified only to the extent that plaintiff have and recover from defendant the sum of $3,500, payable in the same manner as provided in the original decree. All costs are taxed to defendant.

AFFIRMED AS MODIFIED.