ENA F. LIPPINCOTT, APPELLEE, V. HARVEY R. LIPPINCOTT, APPELLANT.

3 N. W. (2d) 207

FILED MARCH 27, 1942.   No. 31241.

*Dryden, Dryden & Jensen* and *J. L. Grimm,* for appellant.

*Mothersead & York* and *Lewis F. Shull, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

PAINE, J.

This is an appeal by the defendant from a decree granting a divorce and alimony.

On April 5, 1940, plaintiff filed a petition for divorce, alleging that they were married October 30, 1921, at Gering, and that ever since said date the parties have been residents of the state of Nebraska; that at the time of their marriage plaintiff was 18 years of age and defendant 21; that neither possessed any property, but by hard work and their joint efforts they accumulated property; that defendant's mother was an invalid at the time of the marriage, and plaintiff at once entered the household of defendant's father, his brother, then 10 years of age, and his sister, 13 years of age, and in addition to performing all the duties of a farm wife, such as raising a garden, taking care of the poultry and dairy products, she cared for defendant's invalid mother, who died the following summer after their marriage; that the plaintiff looked after the brother and sister of defendant, and

cooked for as high as 25 or 30 men in threshing time, that she has assisted defendant to get contracts for threshing, that she has herded sheep, assisted in putting up hay, and by her joint efforts the defendant is now a man of large wealth and means, and owns several productive farms in Scotts Bluff county and Buffalo county, together with a large amount of personal property, and that plaintiff is without means of any kind; that she has conducted herself as a proper and dutiful wife, but defendant has treated her cruelly, because of his quick, ungovernable temper, as a result of which the plaintiff has become sick and ailing. It is further charged that the defendant is now living in a state of open adultery, and plaintiff prays that she be given the care and custody of the two sons, and an absolute divorce and suitable support money and alimony.

The defendant on October 28, 1940, filed his second amended answer, admitting the marriage of the parties, the birth of the children, and denying the other allegations therein.

Defendant for further answer denies that plaintiff and defendant are now husband and wife, and alleges the fact to be that on February 26, 1937, in the district court for Clark county, Nevada, the plaintiff upon her petition secured a decree of absolute divorce, which decree has never been appealed from, modified, or vacated, and is now in full force and effect; that to obtain this divorce the plaintiff employed her own counsel, submitted herself to the jurisdiction of the court in Nevada, secured her own corroborating witness, in accordance with the statutes of Nevada, many sections of the Nevada law being set out in full in the second amended answer, and in accordance with said law plaintiff established her residence at 506 Seventh street, in Boulder City, Nevada, at which place she had her residence from January 2, 1937, up to and including February 27, 1937; that she employed as her attorneys Noland & Noland, of Las Vegas, Nevada, who filed her petition and filed the appearance and waiver of the defendant, in which he entered his voluntary appearance; that on February 26, 1937,

plaintiff was examined by her attorney, and testified that she had lived in Boulder City for more than six weeks, and testified to various other allegations tending to prove extreme cruelty on the part of the defendant, and that the plaintiff secured as a corroborating witness one J. T. Franklin, of Boulder City, who testified as her witness, and said he had known the plaintiff since January 2, 1937, and that she had resided in one of his apartments continuously since January 2, 1937; that after the plaintiff had secured the decree of divorce in Nevada, as herein set out, the defendant married one Virginia Lippincott at Salt Lake City on November 4, 1937, and that at all times since the divorce was granted the plaintiff has held herself out as the divorced wife of defendant to friends, neighbors and relatives, and has many times called at the residence of the defendant and his present wife, Virginia Lippincott, and stated at all times that the decree of divorce secured by her in Nevada was valid and in full force and effect; that some time in the year 1937, relying upon the divorce secured by the plaintiff in Nevada, the defendant entered into a property settlement with the plaintiff, and they have at all times operated under said property settlement with reference to the provisions for the support of the plaintiff and sons who were the issue of said marriage; that defendant has complied with all the terms and provisions of said property settlement, has paid all sums of money thereunder, and purchased property for the plaintiff in accordance with said property settlement, and has at all times relied upon the Nevada decree of divorce and the terms and conditions of the property settlement; alleges that the plaintiff is now estopped to question the validity of said Nevada divorce decree, and that the Nebraska court is without jurisdiction to try the validity of said divorce for the reason that, under the terms and provisions of section 1, art. IV of the Constitution of the United States, this court is required to give full faith and credit to the judicial record of the district court for Clark county, Nevada, with reference to said divorce, and is without jurisdiction to decree a divorce in Nebraska, the same being *res judicata.*

Defendant charges that since April 18, 1940, the plaintiff has failed and refused to abide by the provisions of the property settlement made in 1937; that she has failed to require the attendance of the two minor sons in school; that she has failed to deliver the custody of the two sons to the defendant, in accordance with the property settlement, and has removed them from the jurisdiction of the district court for Scotts Bluff county, and that she has threatened to perform certain acts, the intent of which is to ruin this defendant, both financially and socially, in the community where he resides; wherefore, the defendant prays that the petition be dismissed, and that the terms of the property settlement be enforced, and that the defendant be awarded the care and custody of the two minor sons.

The plaintiff for a reply to the second amended answer denies each allegation therein not herein specifically admitted, and alleges that neither of the parties has at any time ever been a resident, citizen, or inhabitant of the state of Nevada; that on February 26, 1937, and for many years prior thereto, plaintiff was under the complete domination and control of the defendant, and unable to resist the demands of defendant in any particular whatsoever; that upon defendant's insistence the plaintiff accompanied the defendant to the state of Nevada, intending to stay there for a period of six weeks to comply with his demands and orders that she obtain a divorce from him; that upon arrival in the state of Nevada defendant procured counsel and falsely represented that the plaintiff was a resident of the state of Nevada, and had been for six weeks; that in truth the plaintiff had been present in the state of Nevada for less than 96 hours, but the counsel which defendant employed filed a petition for divorce, to which the defendant entered a voluntary appearance, and that the defendant procured the services of a witness to falsely swear that the plaintiff had been a resident of the state of Nevada for more than six weeks; that the defendant was present in the courtroom, heard all of the testimony, and that the purported decree of divorce was and is absolutely void, because both the plain-

tiff and the defendant were nonresidents of the state of Nevada, and were residents of the state of Nebraska, and said court had no jurisdiction to enter said decree, all of which was well known to the defendant, who informed the plaintiff after the divorce was procured that it was void, and immediately transported the plaintiff to her home in the state of Nebraska, and that he insisted upon and did live with the plaintiff as his wife, claiming that said decree was null and void.

The plaintiff alleges that an alleged property settlement was entered into in contemplation of a divorce, but that the defendant has refused to recognize or comply with the same.

Plaintiff alleges that the property settlement was obtained when she was under the influence and control of the defendant, and that it was drafted by his attorney; that she had no independent advice from any attorney, and signed only upon the insistence of the defendant, and alleges that the same did not then, and does not now, represent a fair and proper division of the joint property of the parties, and does not properly and adequately provide for the maintenance of the plaintiff and her minor sons.

The trial in the case at bar, upon the pleadings herein briefly set out, began on December 5, 1940, several recesses were taken, and on January 22, 1941, another recess was taken because of the sickness of the defendant, and the trial of the case was further continued.

On March 11, 1941, the trial court entered a decree, finding that the plaintiff was a resident of Scotts Bluff county at the commencement of the action; that two sons were the issue of said marriage, and that the younger son, Dale L., died since the commencement of this action, and that Harvey R. is a minor of the age of 18 years.

The court finds in the said decree that the property standing in the name of the defendant is the result of the joint work of plaintiff and defendant. The court finds that some time prior to 1936 the defendant became enamored of Virginia Lippincott, a married woman, and carried on illicit

relations with her, as a result of which conduct the plaintiff in the spring of 1936 commenced an action in Scotts Bluff county for separate maintenance, after filing which action she remained in hiding to avoid the defendant until the evening before the hearing was to occur; that on said evening he discovered her and induced her to go with him that night to the city of Cheyenne, Wyoming, from which city the next morning he induced her to call up the defendant's attorney and request that the suit for separate maintenance be dismissed; that in February, 1937, the defendant transported the plaintiff to the city of Las Vegas, Clark county, Nevada, where she intended to remain for six weeks and file a petition for divorce; that the defendant thereupon engaged an attorney to prepare the petition, and demanded that she sign the same, and that the defendant, in carrying out his scheme, procured the attendance of a witness who falsely testified that the plaintiff had resided in the state of Nevada for more than six weeks, and because of said false representations a purported decree of divorce was entered; thereupon defendant transported the plaintiff back to Nebraska, and subsequent thereto insisted upon and continued marital relations with her.

The court also finds that at the time of the commencement of this action the defendant was living in a state of adultery with Virginia Lippincott, and further finds that the testimony of the defendant that he transported the plaintiff to Las Vegas, Nevada, leaving Scotts Bluff county between Christmas and New Year's, 1936, is false and untrue, and that there is clear and satisfactory evidence that the plaintiff was in Las Vegas only some three or four days prior to the entry of the decree of divorce; that a proper division of the real estate in Scotts Bluff county is to award the plaintiff some 320 acres thereof, with all taxes and assessments paid up to and including the year 1940, and to assign to the plaintiff a certain school-land contract, with all payments due to date paid, but subject to all future payments upon said school-land contract. The court further finds that plaintiff should have the care, custody and control of the

minor son, Harvey R., with the right of the defendant to visit him at reasonable times and for a reasonable length of time.

The district court in said decree, as conclusions of law, finds: (1) That the court has jurisdiction of this action; (2) that the purported decree of divorce in the district court for Clark county, Nevada, is and was at all times absolutely void; (3) that the plaintiff is entitled to a divorce in this action, and to the custody of the minor son; (4) that the plaintiff is not estopped to set up the invalidity of the purported decree of divorce in Clark county, Nevada. The decree grants plaintiff an absolute divorce, and directs that the real estate hereinabove set over and assigned to the plaintiff is to be free of any claims of the father and stepmother of the defendant for payment of annuities or insurance policies, and to so guarantee the faithful carrying out of all terms of the decree the said plaintiff is given a lien against all other real estate of the defendant in Scotts Bluff county. The defendant is restrained and enjoined from molesting the plaintiff, or interfering with her personal liberty, and she is awarded an attorneys' fee of $2,500, to be paid to her attorneys, Mothersead & York.

The defendant sets out several issues in his brief, two of them being as to the validity of the Nevada divorce and whether the plaintiff is not estopped from questioning this divorce which she secured on February 26, 1937. The defendant insists that the property settlement signed by the parties on February 8, 1937, before the Nevada divorce was secured, should be binding upon the plaintiff. The question is presented as to the jurisdiction of the district court for Scotts Bluff county to try the case at bar. Defendant claims that the attorneys' fee allowed to the plaintiff, of $2,500, is excessive.

The evidence and exhibits make up seven volumes in the bill of exceptions, and while it is impossible to review the evidence in this opinion, a few facts will be briefly set out. Plaintiff's father was one of the pioneers of Scotts Bluff county, and she went to school in the winters, and worked

out some summers. In the summer of 1920 she commenced working in the home of Henry Lippincott, father of the defendant, his wife being an invalid.

Plaintiff and defendant were married October 30, 1921, and the plaintiff was compelled to do all the work in the family of her father-in-law and his children, and wait on the mother, who died in the spring of 1922. Harvey, Jr., was born November 27, 1922, and Dale L. was born April 17, 1925. The plaintiff first discovered that her husband was enamored of the wife of his cousin, Vance Lippincott, some time in the year 1926, when they visited them at Hastings, after which Vance Lippincott moved to Grand Island.

This affair continued until in May of 1936, when Virginia Lippincott and her mother came to Scottsbluff and she asked the plaintiff if she would not give her husband a divorce. The plaintiff went to Gering that night and stayed at the hotel, and the next day, May 20, 1936, she filed her suit for separate maintenance in the district court for Scotts Bluff county, but did not ask for a divorce. Plaintiff claims that she was afraid to remain in Scotts Bluff county because of the defendant, and immediately left for South Dakota with her mother, and they only returned the night before the hearing was set in her suit for separate maintenance, and just as they drove up in front of a tourist camp in Scottsbluff the defendant drove up in his car and insisted that plaintiff go with him at once to Morrill and talk over with her father the suit for separate maintenance, but her father was not at home, and so they drove on to a hotel in Cheyenne that night, and then drove to Denver, and on this trip he insisted that she telephone an attorney to dismiss her separate maintenance suit, which she did. Defendant took her back to his home in Scotts Bluff county, where she remained.

In the fall of that year plaintiff moved to Greeley, Colorado, and rented a house and put the two boys in school there, the defendant driving over frequently. About this time Virginia Lippincott and her husband moved to California. After a few months defendant insisted that plain-

tiff return to their home in Scotts Bluff county, and she got a boarding place for the boys at Mrs. Burkett's in Greeley and came back and lived in Scotts Bluff county until the fore part of February, 1937, and he discussed having her get a divorce on many occasions during this time.

On February 8, 1937, defendant's attorney, J. L. Grimm, drew up a property settlement, which both parties signed, and a few days thereafter the defendant took the plaintiff and her sister Blanche and started for California. They stayed over night in Greeley, Colorado, to visit the boys, and finally reached Las Vegas, Nevada, and stopped there from some time in the morning until afternoon, each of the parties seeing attorneys to ask about the divorce laws of Nevada. The same afternoon they left Las Vegas and drove to Parker Dam, south of Boulder Dam, where plaintiff's cousin was working, saw him about midnight, and drove from there to Canoga Park, Los Angeles, reaching there about 9:30 Sunday morning. On Tuesday morning defendant left and drove to Oakland, California, to visit Virginia. Plaintiff visited with several relatives, and on Saturday the defendant returned from Oakland and they planned to start back to Nevada on Monday, but that being February 22d, and a holiday, they waited over so the defendant could get an expected letter from Virginia at the post office, and the next day, February 23, they started for Las Vegas. There were four in the car, plaintiff's sister and her cousin and plaintiff and defendant.

The evidence of the plaintiff as to her stay in Los Angeles is supported by exhibits Nos. 12, 13 and 14, found in volume 4, being letters written by the plaintiff to her sons in Greeley, Colorado, the envelopes being postmarked Canoga Park, California, February 16, 1937, February 18, and one February 21, the latter being postmarked in Los Angeles.

On February 24 the defendant consulted his attorneys, the firm being Noland & Noland, being a man and his wife, and on Thursday, February 25, he took plaintiff to see them. The defendant had coached her just what to say, and she told the attorneys falsely that she had been in Nevada for

six weeks, and was getting a divorce from her husband, who lived at Provo, Utah, where he was employed in a lumber yard, where they had moved after they were married.

Dan V. Noland, a lawyer of Las Vegas, Nevada, employed by the defendant, testified by deposition that the defendant consulted him about his wife securing a divorce, and about a week later came back and brought the plaintiff, and that all of the arrangements were made by the defendant for the plaintiff to secure a divorce, and that he considered that he was attorney for the defendant, who was his client, at all times, although he refused to answer whether the defendant had paid him, as he said it was a confidential communication, thereby claiming privilege on the ground that he was attorney for the defendant. He testified that the plaintiff paid him nothing.

Defendant's exhibit No. 26 is a certified copy of the court records in the district court for Clark county, Nevada, relating to the divorce of plaintiff against defendant, being No. 7362.

Plaintiff's complaint, filed February 25, 1937, alleges that she has been for six weeks prior to that day an actual *bona fide* resident of Clark county, Nevada; alleges the marriage of the parties at Gering, Nebraska, the birth of the two children, and alleges that these two sons are in the custody of their father, who resides in the state of Utah; alleges that there is no community property, and then sets out an allegation of extreme cruelty, and prays for a divorce. Defendant filed his voluntary appearance and waiver.

The decree of divorce was entered on February 26, 1937, and is exceedingly brief, and is signed by William E. Orr, district judge, and recites that plaintiff appeared as witness, allegations of the complaint found true, and absolute decree of divorce granted.

Evidence of plaintiff, as taken by the Nevada court reporter, sets forth in detail the testimony of the plaintiff, in which she swore that she came to Boulder City, Nevada, January 2, 1937, and had lived there continuously ever since, and had lived in the northern part of the state of

Nevada the fall before for about two weeks. She swears that she did not come to Nevada with the intention of getting a divorce, but to find work, and intends to make it her home indefinitely; that the two sons as a result of the marriage are living with their father at Provo, Utah, and that it is agreeable that they remain in his custody; that they are in school at Provo. She testified that he had treated her cruelly, which made her nervous; said he would use profanity at her, and nag her for anything, such as cutting the bread a little too thick, all of which made her nervous, and she left him and could not return and be happy.

J. T. Franklin was the witness called, and swore that the plaintiff had been in continuous use of one of his apartments since January 2, 1937; that she had been there all of that time, and that he had seen her during the daytime.

Defendant's evidence is entirely different from plaintiff's, and is to the effect that plaintiff remained in Las Vegas the time required, and that he wrote her letters there in care of a tavern. This evidence lacks any support in the testimony of other witnesses.

Plaintiff's exhibit No. 5 is an airmail letter, signed "Virginia," on letterhead of Golden West Hotel, Reno, Nevada, postmarked in Reno, March —, 1937, and addressed to defendant at Lyman, Nebraska. It described how she just walked out on her husband, leaving a note for him when she left Oakland with her daughter.

Defendant's exhibit No. 103, found in volume 6 of the bill of exceptions, is the marriage certificate of Harvey R. Lippincott, of Shelton, to Virginia Lippincott, of Hastings, Nebraska, the ceremony being performed by John A. Harter, a bishop in Salt Lake City, Utah, on November 4, 1937, in the presence of two witnesses.

"An appeal lodged in this court from a decree rendered in a suit for divorce suspends such decree and brings the case here for trial *de novo,* and the marital relations continue unchanged until a final determination of such appeal is had." *Westphalen v. Westphalen,* 115 Neb. 217, 212 N. W. 429.

The defendant presents, as his first proposition of law, that where plaintiff commenced an action for divorce in Nevada, and defendant entered his voluntary appearance, and a decree was entered, and where both of said parties relied upon the validity of said decree, and the party against whom the decree was taken, relying on said decree, remarried, entered into a property settlement with his former wife, and complied therewith, then the party taking said decree is estopped to deny or question the validity of the divorce decree in a collateral proceeding in Nebraska.

Defendant cites many cases in support thereof, the first one holding: "Where, in an action in the court of another state for divorce, both parties voluntarily appear, and submit to the jurisdiction, they are bound by the judgment, and cannot avoid it in a collateral proceeding in this state by proof that when the action was brought and judgment rendered neither of them was a resident in that state, and that both were residents in this state." *In re Ellis' Estate,* 55 Minn. 401, 56 N. W. 1056. See, also, *French v. French,* 74 Misc. 626, 131 N. Y. Supp. 1053, and many other cases in annotation, 39 A. L. R. 697.

In *Stevely* v. *Stevely,* 254 App. Div. 743, 4 N. Y. Supp. (2d) 69, the husband who had procured in Mexico a decree of divorce from his first wife, without either being present or resident in Mexico, was not allowed to set up the invalidity of such divorce in defense to an action by his second wife for separate maintenance. See annotation, 122 A. L. R. 1324; *Fisher v. Fisher,* 162 Misc. 775, 295 N. Y. Supp. 451; *Nathan v. Nathan,* 150 Misc. 895, 270 N. Y. Supp. 551.

But, in *McDermott v. McDermott,* 252 App. Div. 875, 299 N. Y. Supp. 956, the court held that the husband was entitled to procure a judgment of divorce in New York, despite the fact that he had participated in procuring a void foreign decree, subsequent to which the wife entered into an alleged marriage.

"There are three parties to a marriage contract—the parties marrying and society—so, the doctrine of estoppel concerns not only the parties to the marriage contract, but

also the public. The contract cannot be dissolved either by agreement or by collusive proceedings in court. *Gurley v. Gorman,* 137 Miss. 210, 102 So. 65. Can appellant rely on estoppel when he, and he alone, is responsible for the facts that constitute the estoppel? We think not. An estoppel against an estoppel destroys each other. 10 R. C. L. 841, sec. 146; 21 C. J. 1110; *Barringer v. Dauernheim,* 127 La. 679, 53 So. 923. Lord Coke expressed it in this language: Two estoppels destroy each other, or 'set the matter at large,' note to 5 Ann. Cas. 845." *Hopkins v. Hopkins,* 174 Miss. 643, 165 So. 414.

"A judgment of divorce rendered in another state or country may be collaterally attacked by showing that the court was without jurisdiction, either of the subject-matter of the suit or of the person of the defendant, without violating the full faith and credit clause of the federal Constitution. In fact it has been said that courts generally have permitted foreign divorce decrees to be impeached 'for want of jurisdiction,' when other judgments could not have been similarly attacked, because of reluctance to permit foreign courts to fix the marital status of resident citizens, and because of the peculiar character of the marriage relation. The collateral impeachment may be made by extrinsic evidence." 27 C. J. S. 1300, sec. 335.

In the case at bar, an examination of the evidence in the bill of exceptions leads to the conclusion that, while the plaintiff, concerning many matters, including the education of her sons, had a mind of her own, yet when it came to her intimate relations with the defendant she was always under his domination and control. When Virginia asked her to give defendant a divorce, she at once decided definitely to leave her husband that very night, and the next day she filed an action for separate maintenance, and went to South Dakota and remained, and only returned the night before the trial; but that night the defendant found her, immediately took her to Cheyenne, and at once induced her to dismiss her suit and resume marital relations.

The whole plan of the Nevada divorce was the work of

the defendant, who alone had a motive to secure one. He took her there, he hired the attorney, all with the intention of complying with the provisions of the Nevada law, but when he secured a witness who would falsely testify to the jurisdictional question of residence, it was the defendant's idea to save the expense and delay of waiting for the required time to elapse, and to secure a divorce by remaining only three or four days. It does not estop the plaintiff from showing the Nevada divorce to be void for lack of jurisdiction, because she was a most willing tool in her husband's hands, and told the perjured story he had coached her to tell; it simply convinces one of his complete domination of the plaintiff in such matters.

. The question which must be decided is this: Was the Nevada divorce void, or voidable, or legal?

The case of *Andrews v. Andrews*, 188 U. S. 14, 23 S. Ct. 237, is frequently cited as a foundation case on this point. It was decided January 19, 1903, coming up on error from the supreme court of Massachusetts. The plaintiff and defendant each claimed to be the lawful widow of Charles S. Andrews, and each petitioned to be appointed administratrix of his estate. Andrews married Kate in Boston in 1887. In 1890 she sued for separate maintenance, which was dismissed when a property settlement was entered into. In the summer of 1891 Andrews went to South Dakota, and on November 19, 1891, filed petition for divorce. The wife, Kate, received notice and appeared by counsel, and filed an answer, denying that he was a *bona fide* resident of South Dakota, or that she had deserted him. Later she withdrew her appearance in the suit, and on May 6, 1892, the decree was granted, and he at once returned to Massachusetts, where he resided until his death in October, 1897.

On January 11, 1893, he married Annie in Boston. She was in ignorance of any illegality of the South Dakota divorce, and at his death there were two children living by this last marriage. The Massachusetts court held under an applicable statute that the decree rendered in South Da-

kota was void, and that his first wife, Kate, was entitled to administer his estate.

It was held that the Constitution of the United States confers no power whatever upon the government of the United States to regulate marriage, or its dissolution, in the states. It was further held that Massachusetts had exclusive jurisdiction over its citizens concerning the marriage tie and its dissolution, and had authority to prohibit them from perpetrating a fraud by temporarily sojourning in another state and procuring a decree of divorce without acquiring a *bona fide* domicile, and that the due faith and credit clause of the United States Constitution does not require the enforcement of the South Dakota decree in the state of Massachusetts.

In *Hollingshead v. Hollingshead,* 91 N. J. Eq. 261, 110 Atl. 19, it is held that a decree of divorce by a foreign state between parties domiciled in this state is absolutely void for lack of jurisdiction. It is argued that, even if the Nevada decree is invalid, she is estopped from setting that up, since it was she herself who instituted the proceedings and obtained the decree in Nevada. Ordinarily, this would be true, but if she had been under duress or compulsion to obtain such divorce, an estoppel would arise against such estoppel. 14 Cyc. 822; *United States Fidelity & Guaranty Co. v. Ettenheimer,* 70 Neb. 147, 99 N. W. 652. In *Holt v. Holt,* 77 Fed. (2d) 538, we have a case referred to many times. The plaintiff and defendant were students, and married in Baltimore in February, 1931, and separated three months later. On June 11 the husband left in an automobile, arriving in Reno on June 20, and on August 3, being the day after the expiration of the six weeks' residence, he filed complaint for divorce. A written notice was mailed the wife in Baltimore, and on August 18 she arrived with her sister in Reno by auto, and her husband's attorney prepared an answer, denying his residence in Nevada and his allegations of cruelty. The husband entertained her right royally in Reno, and she left on the 21st, and on the 25th the husband, with his landlady as a witness, secured a

decree of divorce, and the next day he left Nevada, and has never returned.

In September, 1932, the wife brought suit in the District of Columbia for a limited divorce with alimony, and alleged that she had resumed marital relations with her husband in Reno, became pregnant thereby, and suffered a miscarriage, all of which the husband denied. The trial court held that the Nevada decree was entitled to no faith and credit in the District of Columbia, and that the wife was entitled to a limited divorce with alimony.

Upon appeal it was held that the Nevada decree was invalid, because neither party was ever legally domiciled in that state, and because of the collusion of the parties in the Nevada proceeding, in that her answer filed in that court was obtained by fraud of her husband, and therefore was without effect. See 27 C. J. S. 644, sec. 76; *Estate of Bruneman*, 32 Cal. App. (2d) 606, 90 Pac. (2d) 323; 109 A. L. R. 1018, for exhaustive annotation on estoppel.

In regard to the award of alimony in the case at bar, the district court gave plaintiff approximately a half-section of improved land in Scotts Bluff county, and also required defendant to assign to her a school-land contract, all land to be free and clear of encumbrance, with taxes paid for the year 1940.

In this brief defendant's counsel sets out all of the defendant's assets and liabilities as claimed by the defendant, showing the average valuation placed on the land by the witnesses, making a total value for his real estate in Scotts Bluff county of approximately $50,000. In addition, his personal property in Scotts Bluff county is estimated at $4,650, and the cash surrender value of his life insurance policies at $4,235, $400 of personal property in Buffalo county, $200 cash in the bank, or a total of approximately $59,485. In addition, he owns valuable real estate in Buffalo county, against which there is a mortgage of $23,970.28 and taxes on this land of $550; he owes for machinery and irrigation pump some $4,800 or more, and it is claimed that he owes the mother of Virginia the sum of $8,360. Defendant claims

he is required to pay his father $500 a year under the terms of a declaration of trust, his father transferring certain real estate to him about the time of his first marriage, and also to pay $300 a year for life to his stepmother, and he also agreed to pay the premiums on life insurance policies on the life of his father of $243.10 a year, and he claims these payments under the declaration of trust with his father are liens against the land in Scotts Bluff county. Defendant's father is 66 years of age, and would have a life expectancy of ten years, which would require payments of $8,917.20.

The defendant argues strenuously that, if all of these debts and obligations are properly charged against the assets of the defendant, it leaves him with a net worth of but $22,309.51 at the time of trial, and claims that the real estate given to the plaintiff as alimony had a fair cash value at the time of trial of $25,479.

Against this evidence, the plaintiff submits exhibit No. 149 on page 1205 of volume 7 of the bill of exceptions, which was finally received without objection, and which is an application for a loan made by defendant to the Production Credit Association, which sets out an itemized list of all of the defendant's assets and liabilities, and it shows his net worth on December 9, 1935, was $82,690.34.

Even if it is admitted that his net worth was $82,690.34 on December 9, 1935, it would require a patient investigation to carry all these items down and ascertain defendant's net worth as of the date of the decree, March 11, 1941. This is especially true when the statement shows such items as 5,000 head of lambs, listed as worth $35,000; 4,000 bushels of barley, $1,600; 3,000 bushels of oats, $900; 300 tons of alfalfa, $1,800; 4,600 bushels of corn, $2,760. Doubtless all of this personal property was sold years before this decree was entered, and as to whether these items were sold at a loss or a profit would be a matter of careful investigation for the trial court with the assistance of counsel.

Again, at the time of the trial the defendant had $200 cash on hand, while in this financial statement of 1935 he had cash in the bank of $10,000 and good notes due him of $2,000.

The court must also consider the defendant's earnings since the date of the alleged Nevada divorce, and how much, if any, the plaintiff has assisted in earning whatever property the defendant may have accumulated since that date. On the other hand, the defendant has paid to the plaintiff a large number of payments at the rate of $100 a month, and has bought her a bungalow in Scottsbluff, and placed the title in her name, which may have a value of between $4,000 and $5,000 at this time, and while by this decision the Nevada divorce is found to be absolutely void, and she remains his legal wife up to the date the decree granted by the district court for Scotts Bluff county becomes final and effective, yet all of these payments made to her during the period of time between the alleged Nevada divorce and the granting of the Scotts Bluff divorce should be taken into consideration by the district court in granting her alimony in the case.

This court has held that the amount of alimony granted to a wife varies from less than one-fourth of the value of the property to one-half of the value of the property, and many of the Nebraska cases were reviewed in *Swolec v. Swolec*, 122 Neb. 837, 241 N. W. 771, and in 18 Neb. Law Bulletin, 316, and it is said that there has never been any attempt by this court to fix any rule which would relieve the trial judge of a patient, detailed study of every fact and circumstance relating to each case as it comes on for the allowance of alimony:

This court is satisfied, from an examination of the assets as shown in the evidence, that the award to plaintiff of the large amount of land, including the home place, in Scotts Bluff county, free and clear of all encumbrance, was a larger award than seems to be justified by the evidence which is now before this court, and the same can be said of the amount of the attorneys' fees awarded to the plaintiff's counsel, in the sum of $2,500.

It is found by this court that the alleged Nevada divorce was absolutely void, and of no force and effect. It is further found that the decree of divorce entered in Scotts

Bluff county is valid, and amply justified by the evidence, and is hereby affirmed.

It is found that the amount of the award of alimony to plaintiff and her attorneys' fees are greater than justified by the evidence now before the court. The cause is therefore remanded to the district court to take additional evidence as to the fair value of all the property owned by the parties as of the date of entering the decree, the sources from which it came, the assistance the wife rendered in the accumulation thereof, if other relatives of defendant have definite legal claims on the husband or his property for support that may be considered.

"Although it has been said that permanent alimony in some measure represents compensation to the wife for the husband's breach of his marital obligations, the generally accepted view is that its function is to provide support to the wife." 27 C. J. S. 937, sec. 228.

This court admits that, when additional evidence has been taken, it may then appear that the amount of alimony granted should be increased or decreased, but the trial court must have before it many additional facts to enable it to ascertain the exact financial standing of the parties as of the date the decree was granted in the case at bar, and then award such permanent alimony as the law and the evidence fully warrants under all the circumstances.

It is further ordered that each party pay his own costs on appeal.

AFFIRMED IN PART AND REVERSED IN PART.