WILLIAM B. SMITH, APPELLANT, *v.* ESTHER MEAD SMITH AND ISABELLA H. SMITH, RESPONDENTS.

No. 3601

ISABELLA H. SMITH, APPELLANT, *v.* ESTHER MEAD SMITH AND WILLIAM B. SMITH, RESPONDENTS.

No. 3602

January 10, 1951. 226 P.2d 279.

*Taylor & Gubler,* of Las Vegas, for Appellant William B. Smith.

*Earl & Earl,* of Las Vegas, and *Griswold, Reinhart & Vargas,* of Reno, for Appellant Isabella H. Smith.

*Lewis, Hawkins & Cannon,* of Las Vegas, for Respondent Esther Mead Smith.

## OPINION

By the Court, BADT, C. J.:

This action was commenced below by Esther Mead Smith against William B. Smith and Isabella H. Smith. We shall refer to the parties hereafter by their given names. William and Isabella appeared separately

through separate counsel, and answered and cross complained. From a judgment in favor of Esther, William appealed separately, naming Esther and Isabella as respondents. Isabella also appealed separately, naming Esther and William as respondents. William's appeal is numbered 3601 and Isabella's appeal is numbered 3602 in the files of this court. A bill of exceptions was filed in each appeal, but the two bills of exceptions are identical. Complete sets of briefs were filed in each case. They are virtually identical as to the issues presented for our consideration. As to one point in which Isabella's position is urged as stronger than that of William's, we shall speak later. The foregoing is to simplify the somewhat confusing titles of the causes in the two separate appeals. To all intents and purposes William and Isabella are the appellants and Esther is the respondent. The appeals were argued, together, although each of the three parties was represented by separate counsel.

The two main questions presented for our determination are as follows: (1) May a second wife residing in Florida, upon learning that the man with whom she had been living for a year and a half under the belief that he was her legal husband under a California marriage, had some six months previously, with the consent and stipulation of his first wife, obtained an order from a Nevada court vacating a decree of divorce from his first wife rendered by that court the day preceding the California marriage, sue the said husband and his first wife, both then residing in Massachusetts, in said Nevada court, to set aside such annulling order on the ground that in obtaining same said husband and his first wife fraudulently concealed from the court the fact that the husband after obtaining his divorce decree had remarried?[1]

---

[1] The precise places of residence of the respective parties is in some doubt. None of them appeared personally at the trial. Plaintiff's evidence was by way of deposition, and defendants offered no evidence. It is clear, however, that all parties resided on the east coast of the United States.

The learned district judge answered this question in the affirmative (both defendants having appeared generally and prayed for affirmative relief), remarking that he would never have signed the order annulling the divorce decree had he known that in the meantime the husband had remarried.

(2) In the event we likewise answer this question in the affirmative, we are presented with further questions: (a) May the defendant husband and the defendant first wife plead, as a special affirmative defense to such action, that they had been husband and wife for some 34 years, that the defendant husband was mentally unsound and incapable of entering into the second marriage, that his reason had been affected by an injury some three years previously, that the plaintiff had seduced him, had indulged in illicit intercourse with him, had persuaded him to divorce his first wife and to marry plaintiff, and had wrongfully obtained from him in excess of $500,000, which was the joint property of the defendants? (b) May the defendant husband and the defendant first wife cross complain for a judgment against plaintiff for such sum and adjudging the second marriage to be void? (c) May such cross complaint be prosecuted in the absence of the conditions required by our statute to exist in order to confer jurisdiction upon the district court in actions for annulment of marriage?

The learned district judge answered the second group of questions in the negative, and sustained a demurrer to such affirmative defenses and cross complaints.

Esther filed her complaint in the court below November 29, 1948 and alleged that William and Isabella had been divorced by that court March 26, 1946 and that William and Esther intermarried at Los Angeles, California, March 27, 1946; that on July 9, 1946 said court, on stipulation of William and Isabella, set aside and declared null and void the divorce decree of March 26, 1946, and that at the time the court made such vacating order, William and Isabella concealed from the court

the fact that William and Esther had intermarried in the meantime; that on November 20, 1947, Esther first learned of the vacating order of July 9, 1946; that such last-named order vacating the divorce decree constituted a cloud upon the marriage of Esther and William. She prayed that the vacating order of July 9, 1946 be set aside and that the divorce decree of March 26, 1946 be declared in full force and effect.

William and Isabella filed separate answers and cross complaints. William's answer sets forth, in addition to his denials, two separate and further defenses. He alleged that in about the year 1943 he had suffered a severe head injury, resulting in a serious nervous condition causing him to suffer instability of personality with which he was thereafter afflicted, which at various times overcame his reason and understanding; that from 1941 to 1946 Esther, with full knowledge of his condition, pursued a course of conduct by which she sought to alienate William from his wife Isabella— Esther being much younger and an extremely attractive person; that she "bestowed upon the defendant with great and extreme generosity, her sexual and physical attractions," to such extent as to overcome his reason and understanding and kept him in a state of "almost constant hypnotism"; that William did not possess the necessary understanding to enter into a marriage with her and was incapable of assenting thereto; that the marriage was not one in fact and that Esther did not regard or intend it as such but that she simply consummated the marriage in order to get money from William.

By way of cross complaint he set up two causes of action. The first alleged that his marriage to Esther was void by reason of his lack of understanding as to the import and effect of such marriage ceremony. The second alleged that through the practice of fraud, immoral inducement and undue influence and without any legal consideration, Esther had received from him in excess of $500,000, of which she had received from

him $300,000 within the past four years. William prayed that his purported marriage to Esther be adjudged to be null and void, that he have judgment against her for $300,000 and that an accounting be had to such end.

Isabella's answer contained four additional separate defenses in which she alleged that the decree of divorce dissolving the marriage between herself and William was of no force or effect because her assent to appear in the action was procured by fraud, because William in concert with Esther, who was then present with him in Nevada, represented to Isabella that it was necessary for William to divorce Isabella "in order to save his life" and that such was the only reason for procuring the divorce. She also attacks his residence in Nevada. She also alleges that he was at the time ill, physically and mentally, "suffering from an unstable personality and that his judgment was impaired so that he was abnormally subject to influence, all as a result of a serious head injury received in November, 1943," that Esther exercised undue control over William, induced him to join her in California and go with her to Nevada to obtain a divorce and to obtain Isabella's appearance by false representations; that Esther persistently, frequently and illicitly cohabited with him, and beginning from after November, 1943 "overcame him with her sexual and physical attractions and coerced him with threats to deny him access to them," so that his reason and judgment were impaired; that she completely overcame his reason and "bestowed upon [him] her physical and sexual attractions to the point where he was constantly hypnotized and without reason or understanding." Her cross complaint attacks William's residence and alleges that his divorce from her was consequently void. She repeats William's allegations as to the money obtained from William by Esther and alleges her ownership of a joint interest therein. She too asks that the purported marriage between William and Esther be

annulled and that she be awarded judgment against Esther for her share of the money he is alleged to have given Esther.

(1) Appellants first insist that Esther's complaint does not state a cause of action against either of appellants because her only allegation of damage is that the allegedly fraudulent actions of William and Isabella, in obtaining the vacating order annulling their divorce, constituted "a cloud on Esther's marriage." Appellants say that there are no cases where such cloud upon a marriage has been recognized as a damage. The phrase used is of course a metaphorical one. The courts have used varied phrases to describe the situation. In Cates v. Cates, 202 Mo.App. 352, 216 S.W. 573, 574, the court referred to the right of the wife to protect her marital status "from fraudulent disturbance." It said that such abstract right "to [her] status or condition of being a married woman instead of a divorcee" was a valuable and important right, though it might not entitle her "to lay hold of a horse or a farm." In Bowman v. Bowman, 125 Cal.App. 602, 13 P.2d 1049, 1051, 14 P.2d 558, the allegation of the second wife as to the effect of the setting aside of the divorce decree of the first wife was that it "defeat[ed] and defraud[ed] her of her marital rights," and the court referred to her as one "whose rights as a wife have been injuriously affected by the order  *  *  *," and later as one "whose rights as a wife were involved and entitled to complain of the fraud practiced upon the court and herself." In Carlisle v. Carlisle, 96 Mich. 128, 55 N.W. 673, the court referred to the effect of the vacating order as making the second wife an adulteress. We consider all of the quoted expressions, as well as others of similar nature used by the courts, to be more or less of similar purport and not differing materially from the expression used in respondent's complaint. We must hold therefore that this assignment of error is without merit.

(2) It is next contended that the court had no jurisdiction of the parties or of any of them, as it does not appear that either Esther on the one hand as plaintiff or William and Isabella as defendants, or either of said defendants, resided in Nevada when the action was filed. It is conceded by all parties that this action is not a part of but is independent of the divorce proceedings. Appellants contend however that, as such a separate proceeding in equity, it is one in personam and not in rem. In support of such claim, appellants rely on New York Life Insurance Co. v. Dunlevy, 241 U.S. 518, 36 S.Ct. 613, 60 L.Ed. 1140; In re Indiana Transportation Co., 244 U.S. 456, 37 S.Ct. 717, 61 L.Ed. 1253; Gibbs v. Gibbs, 26 Utah 382, 73 P. 641; State ex rel. Howe v. Moran, 37 Nev. 404, 142 P. 534, and other cases supporting well-recognized rules under which jurisdiction over the person of the defendant is held to be essential to an equitable proceeding in personam against him. We do not regard these cases as governing the case in point. We are satisfied, both by reason and authority, that Esther's action to set aside the vacating order of July 9, 1946, which in turn set aside the divorce of March 26, 1946, was a proceeding in rem and properly lodged in the court that had not only rendered the decree but made the subsequent vacating order. Although other grounds and other reasons are asserted by some of the courts, the theory applied by most of them in cases attacking a judgment previously rendered by the same court in the same state is that the judgment constitutes a res within the state and that the proceeding to set it aside is one in rem. Britton v. Bryson, 216 Cal. 362, 14 P.2d 502; Reybine v. Kruse, 128 Fla. 278, 174 So. 720; State ex rel. Sparrenberger v. District Court, 66 Mont. 496, 214 P. 85, 33 A.L.R. 464. These and other cases are cited in an extensive and well prepared note to Indemnity Insurance Co. v. Smoot, 80 U.S. App.D.C. 287, 152 F.2d 667, 163 A.L.R. 498, commencing at page 504 of the A.L.R. citation. At page

511 of this citation are cases holding contra, and appellants place reliance on such cases. The author of the annotation states that such cases constitute the minority view, and such appears to be the case. We adhere to what we think is the majority rule because we think it is based on sound reason as illustrated by the situation of the parties in the present appeals. For all practical purposes the respondent here might well find herself without adequate remedy and the court without power to purge its records of the fraud if we adhered to the strict view that the proceeding was one in personam and personal service within the jurisdiction required in order to invoke judicial action. The well written and exhaustive briefs of the separate appellants upon this point, as well as the authorities therein cited, have been carefully considered, but we are satisfied that the district court arrived at the proper conclusion as to what appellants characterize as "the crux of the case."

(3) For still another reason we must hold that this assignment of error is not well taken. William and Isabella both appeared generally in the action. They first demurred on the grounds (1) that the complaint did not state a cause of action, (2) that the court had no jurisdiction of the defendants, and (3) that the court had no jurisdiction of the plaintiff. Upon the overruling of their demurrer, each answered generally, denying the material allegations of the complaint, alleging affirmatively that the marriage between Esther and William was not in fact a marriage but one in form only because of William's lack of understanding, etc., and then as the first paragraph of each separate defense and of each separate cause of action for a cross complaint each of said defendants alleged: "That the defendant and cross plaintiff and the plaintiff and cross defendant have submitted to the jurisdiction of the court." Appellants contend that this allegation, repeated many times by Isabella and by William, can have no force in the case

because of the court's action in sustaining plaintiff's demurrer to these defenses and cross complaints, in which affirmative relief was sought by William and Isabella against Esther. No authorities are presented in support of such contention, but the same is based solely on our statute permitting a defendant to demur and answer at the same time. We do not consider the contention sound.

(4) As heretofore noted, the court sustained a demurrer to the affirmative matters thus pleaded in the answers and the cross complaints. In assigning this action of the court as error, appellants support their position under two theories. First, they contend that Esther, having invoked the jurisdiction of the court, asking for affirmative relief, is in court for all purposes and cannot disclaim that jurisdiction insofar as others might be benefited by the action of the court in the proceeding. Citing 21 C.J.S., Courts, sec. 83, P. 122, they say: "The court acquires jurisdiction of plaintiff in an action when he voluntarily comes into court to compel defendant to render to him his rights under the law," and that a court of equity, having assumed jurisdiction for one purpose, will retain it for all purposes, legal or equitable, to the end that complete justice may be accomplished in one action; that the powers of the equity court are co-extensive with the rights of the parties to the suit in the subject matter involved; that equity will not suffer a wrong to be without a remedy; that equity delights to do justice and not by halves; that, in so doing, questions ancillary or incidental to the main question may be determined, although such matters would not, as original causes of action, be within its cognizance; that he who seeks equity must do equity, and must come into court with clean hands. Many authorities are cited in support of these well-recognized propositions.

To this contention respondent replies that the prayer of both William and Isabella that Esther's marriage be

annulled, comes directly within the purview of sec. 4070 et seq., N.C.L.1931–1941 Supp. The pertinent sections read as follows:

"§ 4070. Annulment of marriages whether the same were contracted, performed or entered into within or without the State of Nevada, may be obtained by complaint under oath to the district court of the county in which the marriage was performed (if performed in this state), or in which the defendant shall reside or be found, or in which the plaintiff shall reside, if the latter be either the county in which the parties last cohabited, or in which the plaintiff shall have resided six weeks before suit be brought, for any cause which is now provided by law for annulment of marriage, or which is a ground for annulling or declaring void a contract in a court of equity."

"§ 4070.02. No court in this state shall have authority to annul any marriage performed, contracted or entered into out of the State of Nevada unless one of the parties shall have resided in this state for the period of six weeks before filing of the complaint."

Appellants assert that they satisfy the requirements of these sections, for the reason that William's cross complaint alleges "that the defendant and cross complainant [William] *had resided* in Clark County, State of Nevada, six weeks before this action was brought." They contend that this is all that is required by sec. 4070.02 and that sec. 4070 requires only that the action be brought "in the county in which the plaintiff *shall have resided* six weeks before a suit be brought." (Emphasis supplied.) On this rather vital phase of the appeal, despite the voluminous briefs filed on other points and despite the extended time allowed for oral argument, we find no further exposition in the briefs or oral argument, and no authorities have been cited to the court.

Appellants' contention on this point is that under the provisions of secs. 4070 and 4070.02 a married plaintiff, who had at any time in the past resided for six weeks in a county in the State of Nevada subsequently to his

marriage and then left the state, could, after the lapse of many years and without further residence in the state, apply to the court of that county in which *he had once resided,* for an annulment of his marriage. We think that the wording of sec. 4070 clearly requires (other statutory conditions being absent) that the plaintiff be a resident of the county to whose district court the application is made. Omitting the inapplicable portions, it reads: "Annulment of marriages * * * may be obtained by complaint under oath to the district court of the county * * * in which the plaintiff shall reside, if the latter be * * * the county * * * in which the plaintiff shall have resided six weeks before suit be brought * * *." This is not enlarged by the provisions of sec. 4070.02. We are satisfied that a nonresident plaintiff, relying upon a previous residence long since terminated, does not bring himself within the requirements of the sections.

But does the fact that Esther sought the equitable relief of the court and submitted herself to the jurisdiction, or does the clean hands doctrine, or equity's delight to do entire justice, or the fact that the powers of the equity court should be exercised coextensively with the rights of the parties to the suit in the subject matter involved, or any of these considerations, permit the court to escape the bounds upon the jurisdiction fixed by secs. 4070 and 4070.02, N.C.L.? May the court's natural abhorrence of the actions of Esther assuming the allegations of the answers and cross complaints to be true, be used as its justification for permitting proof of such acts and, if the same are found true, to annul the marriage between Esther and William? We think not.

In Anglim v. City of Brockton, 278 Mass. 90, 179 N.E. 289, the court held that these considerations did not extend so far as to permit the party to have relief in equity *where statutes in force required him to seek his relief in another way.*

In Weiss v. Ahrens, 24 Colo.App. 531, 135 P. 987, the court referred to the well-established principle that the chancery court would try all questions, whether legal or equitable, when it assumed jurisdiction for the purpose of granting necessary equitable relief, *when it is not deprived therefrom by statute.*

In Middlesex Concrete P. & E. Corp. v. Northern States Improvement Co., 129 N.J.Eq. 314, 19 A.2d 48, 50, while recognizing the rule "that equitable cognizance of a cause for a particular purpose embraces concurrent jurisdiction over all other matters in issue," the court further said: "It is not, of course, applicable if in contravention of the intention of the law-making body, express or implied."

It is said in 30 C.J.S., Equity, sec. 67, P. 421: "The rule as to retention of jurisdiction by equity to afford complete relief will not be applied where to do so would be in contravention of statutory provisions * * *."

In United Drug Co. v. Kovacs, 279 Pa. 132, 123 A. 654, 656, plaintiff filed its bill in equity to restrain defendants' unfair competition in packaging its products in imitation of those of plaintiff, and also prayed that defendants be adjudged to pay penalties prescribed by statute for such unlawful imitation. The trial court held, first, that plaintiff had presented a clear case of willful, unfair competition, remediable in equity irrespective of statute, and ordered an injunction and an accounting of profits, and, in addition, the payment of statutory penalties. The last part of the order was reversed by the Pennsylvania supreme court because of the statutory provision that such penalties must be "sued for in any court having jurisdiction of an action for a fine or penalty," *"thus excluding a court of equity."* (Emphasis supplied.) The court said: "We are aware that when a court of equity has once obtained jurisdiction, it will ordinarily round out the whole circle of controversy * * * but this principle cannot be extended

to permit, in equity, a recovery based solely upon a statute, clearly specifying an entirely different jurisdiction for establishing the liability." A similar situation appeared in Century Distilling Co. v. Continental Distilling Co., 3 Cir., 106 F.2d 486, 490, where a similar order was made on the defendant's cross complaint. There the circuit court, citing United Drug Co. v. Kovacs, supra, and similar cases, held that equity's desire to grant full relief, "once jurisdiction is obtained," would not be used to contravene the direct provisions of a statute which clearly defined the jurisdiction.

We entertain no doubt as to the right of the court in a suit in equity to purge its records of the fraud committed by William. Lauer v. Eighth Judicial District Court, 62 Nev. 78, 140 P.2d 953; Bowman v. Bowman, 97 Cal.App. 613, 275 P. 1023; Carlisle v. Carlisle, 96 Mich. 128, 55 N.W. 673; Britton v. Bryson, 216 Cal. 362, 14 P.2d 502. Whether or not Isabella was a party to that fraud, it can only be purged by setting aside the order that purported to vacate the divorce decree. Esther's fraud in the contracting of the marriage between her and William could not tie the hands of the court or prevent it from purging its records of the fraudulent concealment that resulted in the vacating of the divorce decree.

It is said in 30 C.J.S., Equity, sec. 98b, p. 490, that as the unclean hands maxim is one founded on public policy, public policy may require its relaxation. This doctrine was applied in Rhodes v. Miller, 189 La. 288, 179 So. 430, 433, in which Rhodes sought an annulment of his marriage to defendant. He alleged that his first wife had divorced him because of his open adultery with defendant, and that his subsequent marriage to defendant was therefore void under the Louisiana statute. Defendant pleaded the clean hands doctrine, but the Supreme Court of Louisiana, in rejecting such plea,

said: "In such a case the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom the relief is granted is simply the instrument by which the public is served." It is true that under the Louisiana statute there involved the marriage was void, while the order vacating the divorce decree here was voidable only, yet we are impressed with the theory that Esther was merely the instrument by which the lower court purged its records of the fraud and preserved its own integrity. Public policy will not, in our opinion, permit the clean hands doctrine to deprive the court of this power. See also, Axtell v. Axtell, 183 Ga. 195, 187 S.E. 877.

However, with this accomplished, was the court, under the well-recognized practices in equity above mentioned, required to proceed to a complete determination of the issue as to the fraudulent nature of Esther's marriage to William? That marriage, if fraudulent, is not, in the absence of jurisdiction over the parties or the subject matter, one in which the courts of this state are interested. William is not without relief. He may seek that relief in a forum having jurisdiction over the person of Esther. He may undoubtedly seek that relief in the courts of this state if he should again be a bona fide resident thereof and otherwise comply with the requirements of our statutes. If this appear to be an additional hardship upon Isabella, we can only say that the situation is one of their own making. They were husband and wife for many years. William established his residence in Nevada and obtained a decree of divorce upon the voluntary appearance of Isabella. That decree of divorce was vacated by the fraudulent concealment of the intervening marriage. Isabella now says she consented to the divorce decree only because she was persuaded that the divorce was necessary in order to save William's life. Who or what was threatening his life or how a divorce would avert this threat, or whether the

danger still impends, she does not say. She does say that she was no party to the fraud and now thinks that William was not a resident of Nevada when he obtained his divorce. Unwittingly then, by her appearance and stipulation in the divorce case, and in any event by her later stipulation for vacating the divorce decree, she became a party to William's fraud. Her contention must fall with William's. See, Confer v. Second Judicial District Court, 49 Nev. 18, 234 P. 688, 236 P. 1097.

That fraud being purged from the records of the district court, the parties must now be left to extricate themselves from their difficulties in a proper forum. William's California marriage to Esther in itself involves no fraud on the district court. Appellants rely on Bowman v. Bowman, 125 Cal.App. 602, 13 P.2d 1049, 14 P.2d 558; which involves facts in many respects similar to those in the case at bar and in which relief was granted to parties occupying in many respects the same position as William and Isabella· with regard to their relationships to Esther. However it does not appear that any question was involved as to the effect of residential requirements of any California statute in annulment proceedings. Indeed, it affirmatively appears from the statement of facts that all three parties involved in the triangular affair were at all times, except for some brief absences, residents of the State of California. On account of that very vital distinction we cannot feel that we are governed by that case, on this point. Moreover, there the court purged its record of the fraudulent entry of a final decree of divorce obtained through concealment by the plaintiff of the fact that since the entry of the interlocutory decree the parties had become reconciled, had for a' time again lived together as husband and wife and had thereafter again separated. It then, at the suit of the wife (defendant husband appearing and admitting the allegations of her complaint) set aside the husband's marriage to his second wife, which

had taken place shortly after the fraudulently obtained final decree—such second wife having been the moving party to the fraud. There the divorce decree was obtained by fraud. Here the divorce decree was vacated by fraud. In both cases the trial court properly purged its records of the fraud. The Bowman case, so strongly relied on by appellants, is not authority for the contention that Esther's fraud could serve to prevent the district court from purging its record of William's fraud. "When parties are in pari delicto," said the court, citing 12 Cal.Jur. 779, "a court will leave them where it finds them, after purging its records of the fraud practiced upon the court." [125 Cal.App. 602, 13 P.2d 1052.] The effect of the trial court's judgment in the case at bar was to apply this doctrine. It said, in effect, that it would not hear evidence of Esther's fraud as a defense against purging its record of William's fraud, but that after such purge, being precluded by the statute from entertaining William's complaint to annul his marriage to Esther, it would leave the parties as it found them. With this conclusion we are in accord. Whatever other affirmative relief may be denied to Esther in equity by reason of her conduct, that conduct cannot serve to validate the fraudulently obtained order setting aside the divorce decree.

However we analyze the position of William and Isabella, the relief they seek, whether by their cross complaints or their affirmative defenses, is the annulment of the marriage between William and Esther. They first sought to accomplish this by vacating the divorce decree that dissolved the marriage of William and Isabella. They now say that, despite the subsequent discovery of William's fraudulent concealment (in whose fruits Isabella participated) such accomplishment should be permitted to stand because Esther should not be permitted to invoke the assistance of equity. But there always was, and there will continue to be, a proper forum open to William in which he may seek to annul

his marriage to Esther. He is in no worse position now than he was at any time in the past (subject to the possible effect of intervening occurrences or conditions) to seek such relief. This remedy always has been and still is available. It is plain, simple and adequate. If it is not as speedy as William and Isabella would like, that is the result of the fraud practiced upon the court on July 9, 1946.

Appellants cite numerous authorities to the effect that William's subsequent marriage to Esther did not in itself deprive the court of power to make the vacating order of July 9, 1946. See Hollingshead v. Hollingshead, 91 N.J.Eq. 261, 110 A. 19; Lippincott v. Lippincott, 141 Neb. 186, 3 N.W.2d 207, 140 A.L.R. 901; Hall v. Hall, 70 Mont. 460, 226 P. 469. This we may concede. But the basis of the judgment from which this appeal is taken is not the mere fact of the remarriage, but its concealment from the court when the latter vacated the divorce.

Many incidental points of law and numerous additional authorities, in addition to those discussed in this opinion, are presented in the voluminous and carefully prepared briefs of appellants. These have all been considered, but discussion of them is unnecessary and would only prolong this already too long opinion. We are satisfied that the rulings of the trial court were correct. Neither its action nor our affirmance thereof will prejudice the right of William to seek, in a proper forum, to annul his marriage to Esther and to seek such further relief as to property rights as may be proper in that forum.

Respondent interposed a motion to dismiss the appeal and the motion was submitted on briefs at the same time as the submission of the appeal on the merits. The motion is denied, and appellant is allowed such costs as may have accrued on such motion.

The judgment and the order denying the motion for

new trial are hereby affirmed with costs. This opinion will serve for both appeals, Nos. 3601 and 3602.

EATHER, J., concurs.

MERRILL, J., having become a member of the court after the argument and submission of this appeal, did not participate.